Filed 12/1/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S033901 |
| v. | ) | |
| | ) | |
| CATHERINE THOMPSON, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. SA004363 |
| _____ | ) | |

A jury in Los Angeles County Superior Court convicted defendant Catherine Thompson on September 15, 1992, of both conspiracy to murder and the first degree murder of her husband, Melvin "Tom" Thompson. (Pen. Code, §§ 182, 187; all further statutory references are to this code unless otherwise indicated). The jury also sustained a special circumstance allegation that defendant committed the murder for financial gain. (§ 190.2, subd. (a)(1).) On September 28, 1992, after weighing the aggravating and mitigating evidence presented by the parties, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

1

# I. GUILT PHASE

## A. Facts

### 1. *Financial Dealings Before the Murder*

Melvin Thompson (Melvin) owned and operated Kayser Service and Community Brake (hereafter Kayser Service), an auto repair shop in Santa Monica, since 1982. Initially, he controlled the finances of his business. He had separated from his wife, Mellie Thompson, in 1978, and they eventually divorced; their marital dissolution agreement specified that Mellie could live in their jointly owned home on South Sycamore Avenue until 1988, when their youngest child would turn 18 years old, at which time either Melvin or Mellie would buy the other out, or the house would be sold and they would split the proceeds.

Melvin and defendant married sometime after his divorce from Mellie, and they bought a house together on Hillary Drive. Defendant eventually began handling the finances of the Kayser Service business. From 1986 to 1988, however, while working as an office manager at a business called Edith Ann's Answering Service (hereafter Edith Ann), defendant incurred a debt to her employer of more than $33,000.[1] Defendant agreed to repay the amount and gave Edith Ann a deed of trust on the Hillary Drive home on which she had forged her husband's signature. Defendant did not tell him about the matter.

After paying $7,500 on the note she had given to Edith Ann, defendant ceased payment and the house on Hillary Drive went into foreclosure in September 1989. Tony DeGreef of BID Properties purchased the home and began

---

[1] In fact, defendant had embezzled the money from Edith Ann, but defendant avoided criminal prosecution by agreeing to repay the embezzled funds. The trial court initially ruled evidence of the embezzlement inadmissible at the guilt phase, but later admitted the evidence to show a motive for the murder, a decision defendant challenges on appeal. (See, *post*, pt. I.B.8.)

eviction proceedings. One of defendant's friends, Isabelle Sanders (Isabelle), contacted DeGreef to discuss whether defendant could repurchase the home. During these negotiations, defendant falsely told DeGreef that Isabelle was her mother, and that defendant's husband was very ill and thus unavailable to participate in the negotiations. In fact, defendant had instructed DeGreef not to inform her husband about the foreclosure. Defendant told DeGreef she wanted to buy back the house in her maiden name, Catherine Bazar, because of her bad credit history. When DeGreef expressed concern that defendant did not have sufficient funds to repurchase the home, she falsely told him she would be receiving money from a trust and a life insurance policy. DeGreef agreed to rent the home to defendant for $4,500 per month while they negotiated the terms of the repurchase.

While this was occurring, Mellie Thompson was trying to purchase her ex-husband Melvin's ownership interest in the South Sycamore Avenue house. At the same time, in November 1989, defendant embarked on a fraudulent scheme to obtain a loan using Mellie's South Sycamore Avenue home as collateral. To facilitate the fraud, defendant obtained a temporary driver's license in Mellie Thompson's name, and Isabelle's son, codefendant Phillip Sanders (hereafter sometimes Phillip), obtained a temporary driver's license to pose as Melvin Thompson. The two, along with Isabelle, met with Dorothy Reik, a mortgage broker, and negotiated a refinancing of the South Sycamore Avenue house. Reik testified that Isabelle appeared to be in charge of the negotiations and that she introduced defendant and Phillip as "Mellie and Melvin Thompson." When Reik noticed the temporary licenses, which had no photos, had been procured that very day and that the listed weight for "Melvin" was inconsistent with Phillip's appearance, she was told the Thompsons recently lost their permanent licenses in a robbery, and that "Melvin" had been ill and lost some weight. When Reik

3

attempted to confirm this story by calling Kayser Service, a woman named "Rene" answered the telephone and confirmed the robbery story. (Defendant's good friend Rene Griffin testified, denying she ever told a loan representative the Thompsons had been robbed, lost their identifications, or that Melvin had recently lost weight.) Because they lacked photo identifications, Reik required independent witnesses to verify the Thompsons' identity. This was provided by Isabelle, her daughter, Carolyn Moore, and Isabelle's daughter-in-law, Carolyn Sanders (Phillip's wife). Reik was satisfied, and defendant and Phillip, posing as Mellie and Melvin Thompson, signed the loan papers in Reik's presence. Reik later described the loan as a "hard money" loan, based on the value of the South Sycamore Avenue home and not the borrowers' creditworthiness.

Defendant and Phillip received $25,000 before escrow closed, and an additional $27,822 thereafter. (The remainder of the $98,000 loan paid off the first deed of trust and accrued property taxes on the South Sycamore Avenue home.)

Around this same time, Isabelle approached Bruce Blum, an attorney, and asked him whether he could help her "daughter," who allegedly had lost her house in a foreclosure. Blum began working for defendant in December 1989 to help her re-acquire the home on Hillary Drive. Defendant gave him a check for $20,000, drawn on the Kayser Service account, to pay the rent on the home through April 1990. Defendant's poor credit prevented her from obtaining financing, so Blum attempted to negotiate the sale in Isabelle's name. When that proved ineffective, defendant obtained a driver's license and Social Security card in her maiden name, Catherine Bazar, and attempted to obtain financing that way.[2]

---

[2] Blum testified he did not attempt to deceive BID Properties, and that defendant did not ask him to do so.

4

In March 1990, defendant (who introduced herself as Catherine Bazar), along with Isabelle, met with mortgage broker David Yourist. Defendant told him she wished to repurchase the Hillary Drive house, was married to a man who operated an auto repair business, but that she would be taking title to the house in her own name. On the application for the loan, she listed her bank as "Community Bank," but the address and telephone number of the bank was, in fact, the address and telephone number of Kayser Service. Yourist sent a request for verification of deposit to a "bank" at that address and received back confirmation that defendant had money on deposit.

Yourist thereafter referred the matter to Jane Rogers, an escrow officer, to prepare the paperwork for the sale. The terms of the loan required defendant to put $42,500 down, with the remaining $412,500 to be financed by the bank and a second mortgage carried by the seller. In lieu of defendant's payment, Rogers received a copy of an assignment of proceeds from a life insurance policy to Catherine Bazar, but Rogers never received any actual money and the sale did not go through. Yourist later learned from the newspaper that the person he knew as "Catherine Bazar" was, in fact, defendant Catherine Thompson. Rene Griffin later denied representing herself to be the operations vice president of "Community Bank" and denied signing a verification of deposit for defendant in that capacity.

In December 1989, Mellie Thompson learned that her home on South Sycamore Avenue had been refinanced without her knowledge or consent. She sued her ex-husband, Melvin, defendant, and others for fraud.

### 2. *Conspiracy to Commit Murder*

Phillip Sanders lived in Sylmar with his wife, Carolyn Sanders (Carolyn). Christine Kuretich met Carolyn in 1988 and the two became close friends. In mid-May 1990, Kuretich moved in with the Sanderses and rented a room in their

5

house.  From that time until the murder on June 14, 1990, Kuretich overheard Phillip and Carolyn Sanders engage in several conversations concerning Melvin Thompson's murder.  Most of those conversations concerned killing him to obtain proceeds of a life insurance policy.  For example, Kuretich heard her housemates say that defendant wanted her husband dead and would pay the Sanderses to facilitate his murder.  In addition, Carolyn told Kuretich that someone named "Catherine" would pay the Sanderses "thousands and thousands" of dollars to have someone kill her husband, and asked Kuretich if she knew anyone who would do the job.  In June 1990, Kuretich took five or six telephone messages from someone named Cathy, asking to speak to Phillip.

Shortly before June 14, 1990 (the day of the murder), Kuretich heard the Sanderses say that Phillip himself was going to commit the murder because they had already received—and spent—money intended as a down payment for the killing, and they could not find anyone else to do the job.  Carolyn Sanders's son, Robert Jones, lived next door to them, and was present for some of these conversations concerning the planned murder.  According to Kuretich, Carolyn asked Jones if he could procure a gun to do the job, and a few days before the murder he told her he had done so.

Phillip worked at Barish Chrysler-Plymouth as a car salesman.  Between May 1 and June 13, 1990 (the day before the murder), the switchboard operator there took several telephone messages for Phillip from "Cathy" or "Mrs. Thompson."  The caller never asked to speak with anyone else.

### 3. The Murder

Charlotte Wark lived in a condominium next door to Kayser Service.  On June 14, 1990, she arrived home around 6:40 p.m. and, as she turned into her garage, she stopped and chatted with Melvin, who was standing inside the gate to

6

his business.  He seemed nervous.  Wark parked her car but was still in her garage a few minutes later when she heard four or five gunshots, which at the time she thought were firecrackers.

Around 6:30 that evening, Michael Lutz was in a gas station across the street from Kayser Service.  He noticed two African-American males in a white Plymouth Acclaim double-parked in the alley next to the car repair shop.  Lutz watched as the passenger exited and the car drove away.  Shortly thereafter, Lutz heard two loud "bangs," saw the passenger reemerge from the alley, and then saw the white Acclaim return and pick the passenger up.  The passenger held his arm across his chest, as if he was concealing something under his jacket.  As the white Acclaim left the scene, Lutz wrote down the car's license plate number.  Lutz then saw defendant, who appeared distraught, emerge from the alley and use the pay phone at the gas station.  Lutz found another telephone and called 911.  He later identified Phillip as the passenger and Robert Jones as the driver.

Detective Kurt Wachter responded to the 911 call and found the victim, Melvin Thompson, in the bathroom at Kayser Service suffering from three gunshot wounds.  He later died in the hospital.  The victim was fully clothed and had on his person a wallet with credit cards and over $1,300 in cash.  When searching the premises, police found a letter indicating that ownership of Kayser Service had been transferred to someone named "Catherine Jacquet."  City records confirmed ownership of the business had been transferred to defendant eight days earlier.  The last name of defendant's previous husband was Jacquet, and defendant sometimes went by the name Catherine Jacquet.

Detective Wachter proceeded to the hospital where he interviewed defendant.  She appeared calm and said she left Kayser Service around 5:45 p.m. to recycle some cans.  When she returned 45 or 60 minutes later, she thought she heard gunshots and claimed she saw an unfamiliar African-American man about

7

30 years old walking away from the repair shop.  She did not say the man she saw was Phillip Sanders, and later denied to friends that he was the person she saw.  She also reported her husband had a Rolex watch that he kept either on his wrist or in a desk drawer at Kayser Service.  When Detective Wachter searched the premises of Kayser Service, he failed to find the Rolex watch, although he noticed two large bags of empty aluminum cans.

Police traced the license plate number provided by Lutz and discovered it was a car Phillip had recently rented.  Police went to Phillip's Sylmar home around midnight on the night of the murder and found the car parked in the carport, its hood still warm.  Phillip's wife, Carolyn, admitted police into the house; Phillip was sitting on the couch.  Detective Wachter noticed a set of car keys in plain sight on the kitchen table bearing a Thrifty Rent-A-Car tag, and obtained Phillip's consent to search the car.  Phillip denied he had driven the car after 6:00 p.m. or had been in West Los Angeles that evening.  Near the keys, Wachter also observed a piece of paper with defendant's telephone number on it.  After confirming the keys fit the Acclaim, police arrested Phillip.  In a subsequent interview with police, Phillip continued to claim he had not used the car that evening and also claimed he did not know who killed Melvin Thompson.  He would later testify that these assertions were untrue.

After Phillip's arrest, Carolyn Sanders immediately called Kuretich around 1:00 a.m. and asked her to return home.  Carolyn was very upset and told Kuretich what had happened.  Gregory Jones, Phillip's brother-in-law, came over and discussed the murder with Carolyn.  After he left, Carolyn told Kuretich that she believed Gregory Jones had provided police with information implicating Phillip in the murder, and if asked by police Kuretich should place the blame for the murder on Gregory Jones.  Kuretich thereafter repeatedly told police Gregory Jones was responsible for the murder, until police suggested she take a lie detector

8

test, at which point she changed her story and implicated defendant as well as Phillip and Carolyn Sanders. Kuretich left the state after the preliminary hearing but was later located in Kansas and returned to California.

Defendant's friend, Nancy Rankin, testified that after the murder she was driving home from the hospital with defendant and Rene Griffin when she heard defendant exclaim, to no one in particular, "it wasn't supposed to happen this way," or "I didn't mean for it to happen this way."

Rankin was under the impression the victim was killed for his Rolex watch. Defendant told her two men had been arrested in San Francisco in possession of the victim's watch. Although defendant told Rene Griffin the victim had brought his Rolex watch to work, intending to take it to a jeweler for repairs, and that someone had been arrested in San Francisco with the watch, police had no information about anyone having been arrested in San Francisco in possession of the victim's watch.

Carolyn Walsko, who worked for Prudential Insurance, testified the victim was the subject of two life insurance policies, one for $100,000 (issued in 1988) and a second one for $150,000 (issued in 1990, the year of the murder). The latter policy had a double indemnity clause for accidental death, which included homicide, making it potentially worth $300,000. A Prudential Insurance sales agent testified that Melvin's insurance premiums were high (about $1,145 per month) but not unreasonable given Melvin's reported income (about $250,000 per year) and his lack of retirement savings. Shortly after the murder, defendant submitted a claim on Melvin's life insurance policies and assigned the rights to the policies to Tony DeGreef of BID Properties to enable her to repurchase the Hillary Drive house.

On June 18, 1990, four days after the murder, police arrested defendant, informing her she was being arrested for hiring someone to kill her husband. She

9

blurted out: "I didn't know Phil at all. I only met him once and that was about the sale of a car." According to the arresting officers, they had not mentioned Phillip Sanders or "Phil" to defendant. She was released from custody a few days later.

Melvin Thompson's funeral occurred while defendant was in custody. She instructed Rene Griffin to collect all of the jewelry from the victim's body after the funeral and return the items to defendant. Defendant later pawned the jewelry and used the money to go on a gambling vacation in Laughlin, Nevada. Rankin and Griffin said the trip was their idea.

The victim's son, Tommy Thompson, Jr., worked at Kayser Service with his father and continued to work there after the murder. After Melvin married defendant, she took over managing the auto shop as well as other parts of his life. When Tommy told Melvin his concerns about defendant's intrusiveness in the business, he became angry. According to Tommy, defendant's friends Isabelle Sanders, Rene Griffin, and Patricia Ceaser often hung out with defendant at Kayser Service. In addition, Tommy had seen both Phillip Sanders and Robert Jones at the shop in the weeks before the murder. After Melvin was murdered, defendant had Rene Griffin come by the shop on a daily basis and collect the day's cash. Tommy later learned that the rent on the business had not been paid and confronted defendant about it. She falsely told him she had paid the rent and promised to take care of the matter. Tommy eventually stopped allowing Griffin to collect the receipts for defendant and began handling the financial aspects of the business himself.

Tommy Thompson turned over to police several documents found in the Kayser Service office. One was a letter written by someone named "Katrina Brazarre" on letterhead stationary from an institution named "Guaranty Bank and Trust Co." Tommy also found some rub-on stencils that could be used to create that letterhead, and a letter under the blotter on the desk where defendant usually

10

sat that contained a precise physical description of his father, as well as his exact work schedule.

### 4. *Phillip Sanders's Evidence*

Codefendant Phillip Sanders testified he met defendant though his mother, Isabelle Sanders. Phillip admitted he obtained a driver's license in victim Melvin Thompson's name, posed as Melvin, and helped defendant obtain a loan by forging Melvin's signature 11 times on loan documents. His wife, Carolyn, and sister, Carolyn Moore, were also in the real estate office when he posed as Melvin. His mother asked him to do this to help her friend avoid losing her house. For their trouble, Isabelle gave Phillip and Carolyn each $100. Phillip claimed not to know how much money changed hands in the transaction, although he was impeached by evidence showing he forged the victim's name on a $25,000 check. When he later became worried about the fraudulent nature of the transaction, Isabelle told him not to worry because "it was not a problem" and "it was going to help her friend save her house and everybody was fine with the situation."

Phillip testified that defendant came to the car dealership where he worked to inquire about purchasing a car for her son, Girard Jacquet. When a credit check revealed neither defendant or Girard would be able to finance a car, defendant asked him whether he knew anyone she could hire to kill her stepson, Tommy Thompson, suggesting she would benefit financially should Tommy die.[3] Phillip told her he was unaware of anyone who would do such a thing, but later discussed the conversation with his wife, Carolyn. Carolyn later mentioned the murder-for-

---

[3] Defendant's husband, Melvin Thompson, was also known as Tom Thompson. Phillip was quite clear in his testimony, however, that defendant had solicited him to kill her stepson, *Tommy* Thompson. Tommy Thompson later testified on rebuttal that he had no insurance on his life in 1990.

hire issue to her housemate, Christine Kuretich. A week later, defendant again asked Phillip about killing her stepson for "a couple of grand," but he repeated that he did not know anyone who could help her. Phillip denied Kuretich's account that the Sanderses discussed killing defendant's husband, testifying, "Those conversations did not take place."

Records showed that in the six weeks prior to the murder, defendant and Phillip were in constant telephone contact. Records showed numerous calls between Phillip's home and Kayser Service, and between Barish Chrysler-Plymouth, where Phillip worked, and defendant's home. Phillip admitted he spoke to defendant several times in the weeks leading up to the murder, but claimed the conversations involved a possible car purchase for defendant's son, Girard. The prosecution showed this to be unlikely, as Girard had purchased a car from a Ford dealership in February 1990.

Phillip testified that he had a cash flow problem and asked if defendant could loan him $1,500. She agreed, and Carolyn Sanders received the money on June 11, 1990. On the day of the murder, June 14, Phillip said he made arrangements to have the terms of the loan reduced to writing so as to avoid any disagreements. This was to be done that evening at Kayser Service. As he had consumed between one and two 20-ounce cans of malt liquor and taken a pain killer and a muscle relaxant, he had his stepson, Robert Jones, drive him in the white Plymouth Acclaim to Santa Monica to meet defendant. Phillip said he walked in the front gate and when he saw defendant inside, she waved him in but motioned to him to be quiet. When he joined her inside the repair shop, the bathroom door opened and, without warning, defendant produced a gun and fired two shots at the person inside the bathroom. The victim, a man with whom Phillip was unfamiliar, fell to the floor. According to Phillip, defendant (holding the barrel of the pistol) handed him the weapon, told him to dispose of it, and that he

12

would be "taken care of." He took that to mean defendant was promising to pay him money. Detective Wachter later testified on rebuttal that the barrel of the weapon would have been uncomfortably hot to the touch after firing. Wachter also offered the opinion that Phillip would not have been able to see inside the bathroom if the door had been opened as he described it.

Phillip testified he walked back to the car and threw the gun into some ivy. When he told Robert Jones what he had observed and that he had discarded the gun, Jones told him to retrieve the gun, so he did. Once back home, Phillip gave the gun to Jones and told him to destroy it. Police arrested Phillip later that night.

While in pretrial detention, Phillip received several unsigned letters which, from their content, he assumed were from defendant, who was also in jail awaiting trial. The letters urged him not to trust his lawyers and to change his account of the murder, vaguely suggesting it would be financially advantageous for him to do so. The letters suggested exactly what he should tell police. Phillip turned these letters over to his attorneys, and at their suggestion wrote defendant back, hoping she would continue the correspondence. Jennifer Lee testified she was a jail inmate with defendant. Lee said she had acceded to defendant's request to copy, in her own handwriting, letters that defendant had drafted. (Defendant's challenge to the admission of these letters is discussed, *post*, part I.B.3.)

**B. Discussion**

*1*. Wainwright v. Witt

During the jury selection proceedings known as "death qualification" (*People v. Mills* (2010) 48 Cal.4th 158, 170–171), the prosecutor challenged seven prospective jurors for cause on the ground their views concerning capital punishment rendered them unfit to serve on the jury. Defendant contends the prospective jurors were not excludable for cause under the standard set forth by

13

the United States Supreme Court in *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*), and that by excusing the seven prospective jurors, the trial court violated her state and federal constitutional rights to due process of law, an impartial jury, and a fair capital sentencing hearing. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 5, 16 & 17.) We conclude the trial court did not err.

The law is settled. As the high court has explained, "the systematic removal of those in the venire opposed to the death penalty [can lead] to a jury 'uncommonly willing to condemn a man to die,' [citation], and thus 'woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 6 (*Uttecht*), quoting *Witherspoon v. Illinois* (1968) 391 U.S. 510, 518, 521; see also *Uttecht*, *supra*, at p. 9 ["a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause"].) The high court set forth the applicable test in *Witt*, *supra*, 469 U.S. 412, and we have explained and applied the *Witt* test in many subsequent decisions. Thus: "To achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath." (*People v. Blair* (2005) 36 Cal.4th 686, 741, citing *Witt*, *supra*, at p. 424, and *Adams v. Texas* (1980) 448 U.S. 38, 45.) " ' "[A] prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause . . . ." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 915.) Even if the prospective juror would not invariably vote one way or another, "[a] prospective juror can properly be

excused for cause if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." (*People v. McWhorter* (2009) 47 Cal.4th 318, 340.)

The degree of a prospective juror's impairment—that is, his or her inability or unwillingness to perform the duties of a juror and follow the law—must be substantial. "[A] juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible." (*Uttecht*, *supra*, 551 U.S. at p. 9.)

Both this court and the United States Supreme Court have cautioned that mere personal opposition to capital punishment is an insufficient basis on which to justify dismissal of a juror during jury selection. " '[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' " (*People v. Jones*, *supra*, 57 Cal.4th at p. 915, quoting *Lockhart v. McCree* (1986) 476 U.S. 162, 176.) "Because '[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State,' [citation], . . . 'a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty . . . .' " (*Uttecht*, *supra*, 551 U.S. at p. 6.)

The critical issue is whether a life-leaning prospective juror—that is, one generally (but not invariably) favoring life in prison instead of the death penalty as an appropriate punishment—can set aside his or her personal views about capital punishment and follow the law as the trial judge instructs. " 'A prospective juror personally opposed to the death penalty may nonetheless be capable of following

15

his oath and the law.  A juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict.' "  (*People v. Stewart* (2004) 33 Cal.4th 425, 446, italics omitted, quoting *People v. Kaurish* (1990) 52 Cal.3d 648, 699.)

That prospective jurors are not always clear in articulating their beliefs (or accurately assessing their ability to set aside those beliefs) is a difficulty trial and appellate courts frequently encounter in capital cases.  Accordingly, although we have cautioned that, "[b]efore granting a challenge for cause, the 'court must have *sufficient information* regarding the prospective juror's state of mind to permit a *reliable* determination as to whether the juror's views would " 'prevent or substantially impair' " ' performance as a capital juror" (*People v. Leon* (2015) 61 Cal.4th 569, 592, quoting *People v. Stewart, supra,* 33 Cal.4th at p. 445), we have also recognized that, " ' "[i]n many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting.  Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected." ' "  (*People v. Abilez* (2007) 41 Cal.4th 472, 497.)

Thus, both this court and the United States Supreme Court have recognized that " ' "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings."  [Citation.] Thus, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's]

16

demeanor, [is] entitled to resolve it in favor of the State." ' " (*People v. Jones* (2012) 54 Cal.4th 1, 41, quoting *Uttecht*, *supra*, 551 U.S. at p. 7.)

In light of the inherent ambiguities associated with the death qualification of juries, two rules have emerged. First, a prospective juror's bias against the death penalty, or the juror's inability to set aside his or her personal views and follow the law, need not be demonstrated with unmistakable clarity. (*People v. Whalen* (2013) 56 Cal.4th 1, 25; *People v. Abilez*, *supra*, 41 Cal.4th at pp. 497–498.) Instead, after examining the available evidence, which typically includes the juror's written responses in a jury questionnaire and answers during voir dire, the trial court need only be left with a definite impression that the prospective juror is unable or unwilling to faithfully and impartially follow the law. (*Whalen*, *supra*, at pp. 25–26; *Abilez*, *supra*, at pp. 497–498.)

Second, in assessing a prospective juror's true state of mind, the trial court occupies a superior position vis-à-vis an appellate court, for the former court is able to consider and evaluate a juror's demeanor during voir dire. (*People v. Whalen*, *supra*, 56 Cal.4th at p. 26; *People v. Jones*, *supra*, 54 Cal.4th at p. 41.) " ' "[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor) . . . gleans valuable information that simply does not appear on the record." ' [Citations.]" (*People v. Scott* (2015) 61 Cal.4th 363, 378.) Accordingly, the trial court's ruling regarding the juror's true state of mind is entitled to deference on appeal if supported by substantial evidence. (*People v. Leon*, *supra*, 61 Cal.4th at p. 593; *People v. Duff* (2014) 58 Cal.4th 527, 541.) As the high court has explained, "[t]he judgment as to 'whether a venireman is biased . . . is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference . . . .' "

17

(*Uttecht*, *supra*, 551 U.S. at p. 7.)  With these precepts in mind, we examine the juror questionnaires and voir dire of seven prospective jurors that defendant claims were improperly excused because of their views on capital punishment.

### a.  Peter B.

According to his written answers in the jury questionnaire, Prospective Juror Peter B. was 65 years old and had spent much of his life serving in the military.  He explained he was generally in favor of the death penalty, having "actively supported" the 1978 initiative to reinstate the death penalty and opposed the confirmation of Chief Justice Rose Bird based on his assessment of her views on capital punishment.  Asked what purpose was served by capital punishment, Peter B. answered:  "It removes from society a very bad person who is a danger to all."  But asked whether a person who intentionally kills should either always, or never, receive the death penalty, he indicated that he "disagreed somewhat" with both propositions, noting that it "depends."  His feelings about the death penalty were not so strong that he would vote one way or the other in every case.

He elaborated on his views during voir dire, telling the trial court "there are certain cases where a crime is so vicious that I believe [the death penalty] would fit the crime."  He would not vote against a conviction or a special circumstance allegation in order to avoid facing the penalty question and, asked to place himself on a spectrum of persons who would either always or never impose the death penalty, he located himself in the center, a five on a scale of 10.  He would have no problem voting for death in a case involving a vicious, multiple killing, but he did not know whether he would vote for the death penalty for a murder with a single victim.

When the trial court asked whether he could vote for the death penalty for an intentional murder for financial gain, Peter B. initially replied he would "favor life imprisonment," but then amended that view, saying he would "always" vote

18

for life imprisonment in that situation. In follow-up questioning, he explained that sentencing someone to death would be "awfully difficult," but that "I wouldn't say never; I wouldn't use the word never. The potential is there." In response to the prosecutor's questioning, the juror further stated he had "some really strong feelings against killing people" due to his training and experiences in the military and in the Vietnam War. He continued: "I've seen slaughters in Vietnam. I never killed anybody. I never came close to being killed, but the danger was always there. [¶] You see all these pictures, and training is brutal in the Armed Forces. The things they show you, the things you go through, the public doesn't see. And I come back, and I don't like that any more. [¶] And I see people that are being sentenced to death, and I sort of sympathize with them. [¶] I understand some of them deserve it, and I said that they got what they should have, but overall the thought of people being put to death sometimes doesn't go well with me. It would have to be [a] very vicious crime for me to [vote for the death penalty]." He would vote for the death penalty for mass killings, like if "somebody . . . went into a dormitory, and killed seven nurses," "but I don't know if I would put a person to death for killing one on one, you know, in a one-on-one situation." Asked by the prosecutor to place himself on a scale of one to 100 for one-on-one murders, with one representing someone who would never vote for the death penalty and 100 as someone who would always do so, he said he was in the "bottom 10."

The prosecutor challenged Peter B. for cause and the trial court sustained the challenge, saying: "With the exception of where he put himself at a 5, and I don't reconcile that with the rest of his answers, other than he seems to be a man who wants to answer his own questions, rather than questions that are put to him, I find he is substantially impaired. [¶] Again, the scale I don't think is a total litmus test, but he sure puts himself in the 1 to 10 down at the—I think every one

19

of his answers, but for the 5—that's a conflict with his scale of one to 100. [¶] I find he's substantially impaired."

Defendant first contends Prospective Juror Peter B.'s views on the death penalty were less objectionable than two jurors the United States Supreme Court found were improperly dismissed in *Adams v. Texas, supra,* 448 U.S. 38. In *Adams*, the high court articulated for the first time what has become known as the *Witt* standard, i.e., "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (*Adams*, *supra*, at p. 45.) Citing two of the jurors in *Adams*—Juror Mahon and Juror Coyle—defendant gleans their voir dire responses from the appendix in the high court's *Adams* opinion and compares them to the voir dire for Peter B.

But using *Adams* as a reference point for evaluating the excusal of Peter B. is inapt because *Adams* concerned the particular statutory scheme in Texas, whereby " '[p]rospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life *will not affect his deliberations* on any issue of fact.' " (*Adams v. Texas*, *supra*, 448 U.S. at p. 42, quoting Tex. Pen. Code, § 12.31(b), italics added.) As the *Adams* court explained, the statutory scheme is inconsistent with the standard demanded by the federal Constitution because "neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." (*Adams*, *supra*, at p. 50.) Those concerns are not pertinent to the excusal of Peter B. Moreover, the individual responses by the two jurors in *Adams*

played little or no part in the *Adams* court's decision to reverse the conviction in that case. The high court's reasoning was more global, explaining that the Texas statute permitted the excusal of jurors who would otherwise be qualified under federal constitutional principles, and thus "the Constitution disentitles the State to execute a sentence of death imposed by a jury from which such prospective jurors have been excluded." (*Adams*, *supra*, at p. 51.) Accordingly, *Adams* does not require reversal here.[4]

Defendant further contends the trial court's suggestion that Peter B.'s responses were inconsistent—first ranking himself as a five on a scale of 10, and then in the "bottom 10" on a scale of 100—is inaccurate. We agree the trial court may have been mistaken on this particular point, for the two metrics concerned different questions. Peter B. described himself as a five on a scale of 10 on *the death penalty generally*, but in the "bottom 10" out of 100 of those willing to impose the death penalty *in the particular circumstance* of a criminal having killed a single victim for financial gain. But the juror equivocated when he first said he would always vote for life in a case of a single murder victim killed for financial gain but then said he would not use the word "never" and the "potential is there" for imposing the death penalty in that circumstance. Defendant argues the juror merely experienced "a moment of confusion," but that is not the only possible explanation, and the trial court was entitled to resolve the ambiguity concerning the juror's true state of mind in favor of dismissal.

---

[4]     Defendant makes the same comparison to the jurors in *Adams v. Texas*, *supra*, 448 U.S. 38, in arguing the trial court erroneously excused Prospective Jurors Nancy N., Maria G., Brenda M., Kusum P., Betty F., and Yolanda N., because of their views on the death penalty. We reject those arguments for the same reason, i.e., that the comparisons to *Adams*, which concerned a very different Texas statute, are inapt.

21

More importantly, in resolving the larger question—whether the juror's views would substantially impair his ability to be fair and impartial—the court's ruling is substantially supported by the record. Noting that the scales were not the "total litmus test" and considering the totality of the circumstances, it appeared to the court the juror was so unlikely to vote for death in a single killing committed for financial gain—in the "bottom 10" out of 100—that he was substantially impaired within the meaning of *Witt*, *supra*, 469 U.S. 412. As noted, *ante*, a prospective juror's inability to fairly weigh the facts and apply the law need not be demonstrated with unmistakable clarity. (*People v. Whalen*, *supra*, 56 Cal.4th at pp. 25–26.) We conclude substantial evidence supports the trial court's decision that Prospective Juror Peter B.'s views permitted his dismissal from the venire.

b. *Nancy N.*

Prospective Juror Nancy N. was 54 years old, African-American, a librarian, and a Republican. Her questionnaire answers revealed a person who was generally "opposed to capital punishment" because the likelihood of "human error seems to indicate that the jurors may convict an innocent person," and that she had voted against the 1978 initiative measure to reinstate the death penalty. Where the questionnaire asked what types of crimes warranted the death penalty, she answered: "None." Asked what purpose the death penalty served, she answered: "Very little—persons who would kill aren't concerned with society's approval." She indicated she would "always" vote against sentencing an offender to death, but disagreed only "somewhat" with the statement that those who kill intentionally should always receive the death penalty.

Nancy N. attempted to clarify her views during voir dire. She admittedly disfavored capital punishment in general and, asked whether there could "ever" be

22

a case in which she would vote for the death penalty, answered: "No, I don't think so." Asked about the notorious serial killer and cannibal Jeffrey Dahmer,[5] she said the death penalty "could be appropriate" and that, in an appropriate case, she could personally vote to impose the death penalty, but estimated only 1 out of 100 cases would fall into that category.

Nancy N. would not decline to vote guilty just to avoid a penalty phase, and she affirmed that although sitting on the jury would make her "extremely uncomfortable," she would consider all the aggravating and mitigating factors before making a penalty decision. The prosecutor challenged Nancy N. for cause and the trial court granted the motion, finding Nancy N. "substantially impaired," adding: "I don't think she even comes close."

Defendant contends the record shows Nancy N. "was a life-leaning juror, but that she was willing to consider and weigh those factors that might support the death penalty." Defendant also emphasizes the juror averred that, "in an appropriate case, she could vote for the death penalty." But although the juror indeed made such assertions, she also said there were no crimes for which she would vote for death, and would always vote against the death penalty. Given these contradictory answers, it was for the trial court to discern the juror's true state of mind. Because she gave some answers suggesting she would not fairly consider death as a penalty in an appropriate case, and would leave open the possibility of capital punishment only in a rare and extreme case, we conclude

---

[5] Jeffrey Dahmer was a serial killer who was convicted of the murder of 15 men and boys between 1978 and 1991. His crimes often involved dismemberment, retention of body parts and, in some instances, necrophilia and cannibalism. <http://time.com/4412621/jeffrey-dahmer-cannibal-murderer-25th-anniversary-arrest/ [as of Dec 1, 2016]> He was beaten to death in prison by another inmate in 1994. <http://www.nytimes.com/1994/11/29/us/jeffrey-dahmer-multiple-killer-is-bludgeoned-to-death-in-prison.html [as of Dec. 1, 2016]>

23

substantial evidence supports the trial court's assessment of the juror's true state of mind, and we defer to its decision to excuse the juror. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 316.)

### c.  Maria G.

Prospective Juror Maria G. was a 36-year-old secretary who wrote in her questionnaire that her views about the death penalty were "50/50" because imposition of it "would depend on the circumstances," and that the penalty would be appropriate in extreme cases like for serial killer Jeffrey Dahmer.  She "disagreed somewhat" that anyone who kills intentionally, or kills more than one victim, should always (or never) get the death penalty, and her feelings about the death penalty were not so strong that she would always vote for, or against, a guilty verdict, a special circumstance allegation, or to impose the penalty itself. Although she was a Catholic, she was "not in <u>total</u> agreement with the church." (Underscoring in original.)

During voir dire, she stated that, as a general matter, she believed the death penalty had a place in society and she thought she could impose the death penalty in an appropriate case, but when asked about a murder for financial gain, she said she "would favor life without possibility of parole" and that it would be "a difficult decision on my part" to vote for the death penalty.  She admitted she might, depending on the facts, "possibly" vote for death under those circumstances, but rated herself only a 2.5 on a 10-point scale of those who, faced with a financial gain murder, would impose the death penalty.

Under the prosecutor's questioning, Maria G. said she rated herself low on the 10-point scale because there were extreme cases such as that of Jeffrey Dahmer for which she would vote for death.  In addition she said she believed cases involving the rape or murder of a child warranted the ultimate penalty. Asked by the prosecutor whether there were other kinds of murders in which she

24

could see herself voting for the death penalty, she replied: "No." Asked directly what kind of evidence would convince her to vote for death in a case involving financial gain, she said the possibility she would vote for death in a financial gain situation was a "slim" one, and that "it's unlikely" she would vote for death in that situation. The trial court then sustained the prosecution's challenge for cause, explaining that "the words 'slim' and 'it's unlikely' " showed her to be substantially impaired under *Witt*, *supra*, 469 U.S. 412.

Defendant argues Prospective Juror Maria G. was unequivocal about her ability to impose the death penalty, that she stated "unambiguously that she would be able to vote for death in certain circumstances, and specified that she could consider the death penalty in rape and murder situations." But when questioned about her willingness to consider the death penalty in situations other than those involving a serial killer or the rape and murder of a child, she offered no other situations in which she would consider death an appropriate penalty. She then equivocated slightly, saying there was a "slim," but "unlikely," possibility she would vote for death where a murder for financial gain was involved. This evidence suggests that, although the juror's views would not wholly prevent her from fulfilling her duties as a juror, they would "substantially impair" her from doing so. The trial court apparently found that she was willing to fairly consider the death penalty only in two narrow circumstances (a serial killer or one who rapes and kills a child) and was not willing to fairly and impartially consider the appropriateness of the death penalty in other types of murders, including the type (financial gain killing) in this case. Although defendant argues this juror did not completely close the door to capital punishment for a person who killed for financial gain, emphasizing she said there was a "slim" although "unlikely" possibility, the *Witt* standard does not require a prospective juror's inability or unwillingness to fulfill her duties as a juror be proved to an unreasonably high

25

degree.  Instead, the evidence must simply show the juror's views " 'substantially impair the performance of [her] duties as a juror.' " (Witt, supra, 469 U.S. at p. 424, italics added.)  On this record, substantial evidence supports the trial court's assessment of Maria G.'s state of mind, and we defer to its decision to excuse her.  (People v. Gonzales and Soliz, supra, 52 Cal.4th at p. 316.)

### d. Brenda M.

Prospective Juror Brenda M. was a 30-year-old administrative analyst working in the psychology department at the University of California, Los Angeles.  She felt the death penalty "is right in a few cases—a very few."  For emphasis, she underlined the phrase "a very few" four times.  Her views stemmed from the fact that "[i]f a verdict is wrong there is no way of righting the wrong."  She "disagreed somewhat" with the statement that "[a]nyone who intentionally kills another person should always get the death penalty," explaining:  "There are circumstances that are not always known."  She "agreed somewhat" with the statement that "[a]nyone who intentionally kills more than one person should always get the death penalty," explaining:  "There could be mental problems that need to be reviewed."

Brenda M. reiterated and expanded on her views during voir dire.  She repeated that she felt there were "very few cases that I would go for [the] death penalty," and when asked whether there were any circumstances in which she would vote for death, she replied:  "I can't say for sure right now, but I would think that I would have a very hard time voting for it."  But when asked by codefendant Sanders's attorney whether she would set aside her personal opinions and follow the law if instructed to do so, she replied in the affirmative, later adding she had no doubt that she could do so.  She affirmed she could follow the court's instruction to consider the two penalties (life in prison without parole or death) should defendant be convicted.

Questioned by the prosecutor, the prospective juror affirmed that the irreversibility of the death penalty was a concern to her, but she would have less concern if the accused admitted his guilt. If a defendant contested his guilt, however, she agreed she would not want to participate in the life-or-death decision. "I'm just saying that I—just in the small amount that I know about the case, I don't think I would go for the death penalty, even not knowing anything—any evidence or even knowing what they did." "I'm trying to think of a case that I would say the death penalty is appropriate. *I can't offhand think of any*." (Italics added.)

The trial court then attempted to clarify the juror's feelings, asking her whether, where a defendant contests her guilt, but the jury finds her guilty beyond a reasonable doubt, the juror would nonetheless refuse to "impose the death penalty because [the accused] never admitted to full complicity in the crime?" She answered in the negative, explaining that a person's admission of guilt would simply make the life-or-death decision "a little bit easier because of the point that there's no slight bit of percentage that they could be innocent."

Asked about different criminal scenarios, Brenda M. replied: "I honestly don't want to make a decision on someone's life or death, and I'm—it's hard to say, but almost in any case, I would probably go for life without possibility of parole just because I can't do that. Okay?" The trial court then asked her: "Do you feel you could personally impose the death penalty yourself in the appropriate case?" She answered: "*I don't think so. No*." (Italics added.) She later elaborated: "You need to deliberate with the jury, and if somebody could give me a good enough reason why I would have to change my own personal feelings on the case, maybe, maybe I could go for the death penalty. [¶] But like I said, *I very much doubt it*." (Italics added.)

27

The prosecutor then challenged Brenda M. for cause, arguing that she was impaired under *Witt*, *supra*, 469 U.S. 412. Defense counsel countered by highlighting the many times the juror said she could impose the death penalty and set aside her personal feelings of reluctance. The trial court excused Brenda M., explaining: "My feeling is if there ever was a situation that is [*Witt*], this is it. The woman is tortured. Both sides attempting to drag her from one side of the line to the other. [¶] I feel there's substantial impairment." The court continued: "I really do feel that she is close to the line. I don't even think she got dragged over the line."

As the trial court observed, whether Brenda M.'s written and oral responses demonstrated that her views about capital punishment would have " 'prevent[ed] or substantially impair[ed] the performance of [her] duties as a juror' " (*Witt*, *supra*, 469 U.S. at p. 424), was a close call. Although she acknowledged that the life-or-death decision would be a difficult one for her, she was open about her views and at times seemed willing to fairly consider both sides. On the other hand, she admitted she could conceive of very few situations in which she would find the death penalty an appropriate punishment (signaling that she might be unable to fairly consider both sides of the question), and eventually stated she did not think she could vote for the death penalty ("I don't think so. No"). Under the circumstances, given that the trial court was able to observe her demeanor (noting, "[t]he woman is tortured"), "[t]o the extent [the juror] gave conflicting answers, the trial court reasonably resolved those conflicts in determining her true state of mind. Because the trial court's determination is fairly supported by the record, we defer to it." (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 316.)

28

*e. Kusum P.*

Prospective Juror Kusum P. was a 34-year-old Indian-American who worked as a maintenance administrator for Pacific Bell. Regarding her views on the death penalty, she stated: "I don't believe that [the] death penalty is good. I won't go for that," and would "instead give some punishment that will change other people." She held that opinion, "[b]ecause if one [person] got [the] death penalty, it's not going to change other people[] committing crimes," and "[i]t's not going to teach [a] lesson." In response to another question, she opined that the death penalty served no purpose. When asked whether someone who intentionally kills more than one person should always, or never, receive the death penalty, she answered paradoxically that she "[a]gree[d] somewhat" to both questions.

During follow-up voir dire, Kusum P. stated she felt the death penalty had no place in our society, that she could not personally vote for it "in any kind of case," and she could not personally "send somebody to the gas chamber and execute them." Pressed on the point, she admitted she did not know whether she could vote for death in the "most heinous, brutal type of killing," and that "maybe" she could in a case in which "five small children were tortured to death." She would not vote not guilty just to avoid a penalty trial, or vote for a special circumstance just to get to a penalty trial. She would not always vote for death or for life without regard for the facts of the case. She reiterated the views expressed in her questionnaire, saying the death penalty does not deter others from committing crimes. Asked by the prosecutor if she could personally send someone to their death, she first said "no," then said: "It depends. When I go to after all the facts [*sic*], like what happened and everything, then I might change my mind, but it's like it depends on what happened and what were the circumstance[s]." But then asked whether, "if the circumstances were really

29

terrible, could you actually look at this individual, and say it's my decision that you should die?" she answered, "No."

The prosecutor challenged Kusum P. for cause and the trial court granted it, explaining: "The court finds based on the answers to the questionnaire, answers in court, she's substantially impaired." As the record demonstrates, Prospective Juror Kusum P. had generally strong feelings against the death penalty. Although she was never asked expressly whether she could set them aside and follow the law, her answers provided substantial evidence that she could not fairly consider both sides. (*People v. Merriman* (2014) 60 Cal.4th 1, 53.) That she gave contradictory answers at times illustrates the high court's observation that "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Witt*, *supra*, 469 U.S. at pp. 424–426, fn. omitted.) As with the other challenged jurors, the trial court fairly determined Kusum P.'s true state of mind and, as it is supported by substantial evidence, we defer to that decision. (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 316.)

### f. Betty F.

Prospective Juror Betty F. was a 54-year-old African-American who worked for a federal defense contractor. She was generally in favor of the death penalty, writing: "I feel [the death penalty] is necessary to deter the increase in [the] unnecessary killing of . . . innocent people." Asked in what type of crime the death penalty should be imposed, she suggested the death penalty was appropriate

30

for crimes that victimized the mentally ill and children. She "strongly disagreed" with the propositions that an offender should "always," or "never," receive a sentence of either life or death, opining that the circumstances of individual cases must be reviewed.

Betty F.'s voir dire began with her largely confirming her written responses. Although she initially expressed reluctance when asked whether she could "personally vote to have somebody executed," she affirmed she could vote for death in some unspecified circumstances. She would not change her vote to avoid a penalty phase nor would she do so in order to get to a penalty phase so she could sentence someone to death. She initially stated that in a case of murder for financial gain, she would not always vote for either life or death, but then admitted she "would prefer life imprisonment" to the death penalty in such cases. Asked to elaborate, Betty F. said she would not prefer life imprisonment "in every situation" or "no matter what the facts [were]," but on a scale of one to 10, with one being someone who would always impose a life sentence, the juror put herself at two on the scale. Questioned by defense counsel, Betty F. agreed she thought the death penalty was appropriate for "horrible" murders such as for those who tortured and killed children. Questioned by the prosecutor, the juror explained her initial answer to the court suggesting she would be reluctant to vote for the death penalty: "I wasn't really prepared to—I didn't think I was going to be able to explain why I felt I could go for the death penalty, but with him I did explain whether or not kind of—what had to be a horrible [crime], and I could in those instances, that I could separate from some of them." But she placed herself as a two on the scale because she "would have a hard time voting for death if all of the circumstances led me to believe it wasn't horrible, horrible." She agreed with the prosecutor that, for a murder that was not "horrible" or "gross," such as involving children, sexual

31

brutalization or dismemberment, it would be extremely unlikely she would vote for death.

At this point the trial court intervened to clarify the juror's views.

"THE COURT: Let me—Here you are not dealing with a child and dismemberment, and you are not dealing with a situation of torture, you are not dealing with a number of murders. One murder that's deliberately done, intentionally done for the purpose of getting money.

"*Can you see yourself imposing the death penalty in that type of case?*

"PROSPECTIVE JUROR [Betty F.]: *No.*

"THE COURT: *No matter what the facts were?* It's not as gruesome as what you were talking about.

"*Would you always vote for life in prison?*

"PROSPECTIVE JUROR [Betty F.]: *Yes.*" (Italics added.)

Thereafter the trial court excused her for cause, explaining: "I find she's substantially impaired," and "I think she's honest. I think this is the difficulty we have with a lot of these people. They just don't comprehend the subject." Although initial indications suggested Betty F. could fulfill the duties of a juror in a capital case, her later elaboration of her views made clear she would never vote for the death penalty in a case of murder for financial gain. It was for the trial court to resolve these ambiguities regarding her true state of mind, and because substantial evidence supports the trial court's determination that she was impaired within the meaning of *Witt* (*Witt*, *supra*, 469 U.S. at p. 424), we defer to the court's decision to sustain the prosecution's challenge for cause. (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 316).

32

*g. Yolanda N.*

Prospective Juror Yolanda N. was a 54-year-old Latina who worked for the Los Angeles County Sheriff's Department in an unspecified capacity. She was generally reticent about the prospect of putting people to death for their crimes, writing: "Although rapist[s] and child molesters . . . are the worst crimes, still I don't know if all deserve the death penalty." Asked the purpose of the death penalty, she wrote that it would serve as an example to other criminals. Asked what type of crime deserved the death penalty, she offered: "Child molesters and rapists." She "agreed somewhat" with the proposition that someone who killed intentionally, or killed more than one person, should "always" receive the death penalty, and "disagreed somewhat" that such persons should "never" be sentenced to death. She affirmed that she would not vote one way or the other "regardless of the evidence presented" in order to reach a certain result.

During voir dire, Prospective Juror Yolanda N. stated that if she thought defendant was guilty, she would not vote to acquit in order to avoid a penalty phase trial, nor would she vote to convict (or sustain a special circumstance allegation) despite entertaining a reasonable doubt simply to ensure that defendant would face a penalty trial. She was then asked whether, "without knowing anything about how or why [a murder] was carried out, without knowing anything about the defendant, would you always vote to impose the death penalty [or, alternatively, life in prison] just because of the type of murder it was?" She replied in the negative, agreeing with the court that she would want to know more about the case before making such a decision. But when later asked by the prosecutor whether she would consider life and death "on an equal basis," she replied that she thought she would lean heavily in favor of life in prison, explaining that, being a religious person, she believed "[a] person should be given a chance to repent." Pressed on the point by the prosecutor, the juror said she did

33

not believe in the Old Testament teaching calling for "an eye for an eye," saying that giving someone the death penalty would be "very much" against her personal beliefs.

The following colloquy then occurred:

"[THE PROSECUTOR]:  So if we asked you then whether or not personally you could ever vote for the death penalty, could you ever personally vote for the death penalty?

"PROSPECTIVE JUROR [Yolanda N.]:  In which case?

"[THE PROSECUTOR]:  In any case of murder?

"PROSPECTIVE JUROR [Yolanda N.]:  *99.9 percent, no.*"  (Italics added.)

The trial court then sought to clarify the juror's views, asking whether, without knowing anything else, if an adult victim was intentionally, and with premeditation, murdered for purposes of financial gain, "do you feel you could ever see yourself voting for the imposition of the death penalty if you felt the facts surrounding the crime or the facts surrounding the defendant would call for it?" She replied:  "Very hard that I would vote for death."  The court then asked:  "You said that you would 99.9 percent [of the time] never vote for the death penalty," to which she replied, "Yes."

The trial court thereafter excused Prospective Juror Yolanda N. without much elaboration, saying:  "The fact that a juror [such a Yolanda N.] favors in the abstract one [penalty] or the other doesn't disqualify [her]."  The important consideration, the court said, was whether the juror's views regarding the death penalty would "substantially impair[]" her in performing the duties of a juror, and the court concluded she demonstrated such impairment when she said she would impose life imprisonment instead of death in 99.9 percent of possible cases of murder for financial gain.

34

As with several other prospective jurors excluded from the jury, although initial indications suggested Yolanda N. could fulfill the duties of a juror in a capital case, more in-depth questioning revealed she would almost never vote for the death penalty in a case of murder for financial gain. It was for the trial court to resolve these ambiguities regarding her true state of mind. Because substantial evidence—in the form of the juror's own statements—supported the trial court's finding that Yolanda N. was substantially impaired within the meaning of *Witt*, *supra*, 469 U.S. at page 424, we defer to the court's assessment (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 316).

In sum, although defendant challenges the excusal of seven prospective jurors due to their views on the death penalty, we find the trial court's determinations that they were all substantially impaired within the meaning of *Witt*, *supra*, 469 U.S. at page 424, adequately supported by the record. We thus reject the claims.

### 2. Denial of Severance

#### a. Introduction

Defendant, along with Phillip Sanders, Carolyn Sanders, and Robert Jones, were jointly charged by felony complaint on August 30, 1990, with conspiracy to commit murder, and murder with the special circumstance that it was committed for financial gain. (§§ 182, 187, 190.2, subd. (a)(1).) When the information was filed several months later on February 19, 1991, all four codefendants were still jointly charged with all counts. Thereafter Phillip Sanders moved to sever his trial from that of his wife, Carolyn, and Jones moved to sever his trial from the others. The motions were partially granted, leaving defendant and Phillip Sanders in one joint trial and Carolyn Sanders and Robert Jones paired in a second joint trial. Defendant and Phillip's trial proceeded first.

Thereafter defendant moved multiple times—before, during, and after trial—to sever her trial from that of her codefendant, Phillip Sanders. Many of her severance motions were accompanied by motions for a mistrial or for dual juries. Her motions were all denied, first by Judge Jacqueline Weisberg, and then by Judge George Trammell when he took over the case.

### b. Applicable Law

Authorization to hold a joint trial of two or more defendants is provided by section 1098, which states in pertinent part that "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, *they must be tried jointly, unless the court order separate trials*." (Italics added.) This law thus establishes a legislative preference for joint trials, subject to a trial court's broad discretion to order severance. In *People v. Hardy* (1992) 2 Cal.4th 86, we described the guiding principles a trial court should follow when exercising such discretion: " 'The court should separate the trial of codefendants "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." ' " (*Id.* at p. 167.) We review a trial court's denial of severance for abuse of discretion (*People v. Cleveland* (2004) 32 Cal.4th 704, 726; *People v. Alvarez* (1996) 14 Cal.4th 155, 189), based on "the facts known to the court at the time of the ruling" (*People v. Box* (2000) 23 Cal.4th 1153, 1195).

Even were a reviewing court to find a trial court abused its discretion in failing to grant a defendant's motion to sever, the defendant would not be entitled to relief on appeal unless she could also demonstrate, to a reasonable probability, that she "would have received a more favorable result in a separate trial." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41.) Conversely, even if a trial court

36

acted within its discretion in denying severance, " 'the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law.' " (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 726.)

### c. The First Motion to Sever (April 3, 1992)

Following the successful severance motions of Carolyn Sanders and Robert Jones, defendant faced a joint trial with her codefendant, Phillip Sanders. On April 3, 1992, defendant made her first motion to sever her trial from that of Phillip Sanders, raising three arguments in support: (1) Phillip's confession to a jail visitor, Juanita Williams, would not be admissible against defendant were she and Phillip tried separately;[6] (2) Defendant would be prejudiced in a joint trial with Phillip because the evidence of Phillip's guilt was much stronger than the evidence against her; and (3) she anticipated that her defense and Phillip's defense would be mutually antagonistic. In court to argue the motion, the parties engaged in a protracted discussion concerning whether Juanita Williams's statement could be effectively redacted to eliminate any specific mention of defendant in order to preserve defendant's confrontation rights. (See *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.) Eventually, the prosecution asserted it would rather forgo using Williams's statement than hold separate trials. In light of that assertion, the trial court suggested the question of redaction might be moot and so turned to the question of inconsistent defenses.

---

[6] Juanita Williams reported to police that she met Phillip Sanders when she visited her son at the jail. During these visits, according to Williams, Phillip confessed to her his part in the murder of Melvin Thompson and referred to the wife of the victim as being involved in the crime.

After defendant's attorneys made an offer of proof in chambers to describe their intended defense, the court announced: "I'm not convinced. I heard the offer of proof as to these allegedly inconsistent defenses, and these problems arise always when you have a joint trial. I don't see anything here that is any different from what happens in many situations, and nothing that would preclude Catherine Thompson from having a fair trial with the cases joined as it is, and it's thoroughly within the court's discretion, and I am exercising my discretion in denying the motion to sever on that basis." The prosecution eventually decided not to have Williams testify.

Defendant first argues reversal is required because Judge Weisberg "*failed to exercise* her discretion under a correct view of the law" because she "did not regard the existence of conflicting defenses as a potential reason to sever." Further, she claims the judge "did not appreciate that the defenses in this case were not merely inconsistent but particularly antagonistic and mutually exclusive." The record belies this claim. After hearing defendant's lawyers describe their expected defense strategy in camera, Judge Weisberg found the claimed conflicts with Phillip's expected defense to be nothing unusual. The expected defenses were indeed conflicting, but not in any manner in which the jury would necessarily conclude that both defendants were guilty, or—given the copious evidence of a conspiracy—that acceptance of one party's defense necessarily meant the other was guilty. "Severance is not required simply because one defendant in a joint trial points the finger of blame at another." (*People v. Homick* (2012) 55 Cal.4th 816, 850.) The record thus demonstrates that Judge Weisberg exercised her discretion to deny the motion, and that she was aware that the degree to which the codefendants' expected defenses conflicted was a factor to consider.

Nor does the mere existence of conflicting defenses demonstrate Judge Weisberg abused her broad discretion. "Although there was some evidence before

the trial court that defendants would present different and possibly conflicting defenses, a joint trial under such conditions is not necessarily unfair. [Citation.] 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis*.' [Citation.] If the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' " (*People v. Hardy*, *supra*, 2 Cal.4th at p. 168, second italics omitted, quoted with approval in *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.)

" 'Thus, "[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other." [Citation.] "Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty." ' [Citation.] When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.)

Defendant argues the existence of antagonistic defenses between codefendants should weigh more heavily in favor of severance than our cases have suggested, citing several lower federal court decisions that she claims require severance whenever jointly tried defendants present antagonistic defenses. (See *U.S. v. Tootick* (9th Cir. 1991) 952 F.2d 1078, 1081–1082; *U.S. v. Romanello* (5th Cir. 1984) 726 F.2d 173, 177; *U.S. v. Ziperstein* (7th Cir. 1979) 601 F.2d 281, 285.) Defendant's cited authorities all predate the United States Supreme Court's decision in *Zafiro v. United States* (1993) 506 U.S. 534, where the high court

39

explained that "[m]utually antagonistic defenses are not prejudicial *per se*. Moreover, Rule 14 [Fed. Rules Crim. Proc., 18 U.S.C.] does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." (*Id.* at pp. 538–539.) Proceeding with a joint trial despite the existence of inconsistent or mutually antagonistic defenses is thus consistent with constitutional guarantees, at least in the absence of some greater showing of prejudice or an unfair trial, as we recently held. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 380 ["the federal Constitution [does not] compel severance when codefendants present conflicting defenses"].)

We also reject defendant's argument that reversal is required because Judge Weisberg failed to appreciate that heightened scrutiny of joinder was required because this was a capital case. We have held severance motions in capital cases should generally receive heightened scrutiny for potential prejudice (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1173; *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 44), but Judge Weisberg undoubtedly knew this was a capital case, and her assessment that the inconsistencies between the anticipated defenses were routine and commonplace was not an abuse of discretion. Moreover, ample evidence—all of which would have been admissible in a separate trial—shows any error was harmless. Such evidence includes the web of evidence demonstrating that defendant participated in a conspiracy with Phillip and Carolyn Sanders and Robert Jones to kill the victim for financial gain, including defendant's many refinancing and insurance frauds, the evidence of many telephone calls between her and Phillip in the days leading up to the murder, her lies about recycling cans the day of the murder and about the allegedly stolen Rolex watch, her lie about having seen a tall unidentified man leave the scene of the crime (when other witnesses identified Phillip Sanders and Robert Jones

40

leaving the scene), her blurted-out statement upon leaving the hospital that she "didn't mean for it to happen this way," and her blurted-out statement upon her arrest that she "didn't know Phil at all. I only met him once and that was about the sale of a car."

Under the circumstances, defendant fails to show Judge Weisberg abused her discretion in denying defendant's pretrial motion to sever (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41), or that denial of severance resulted in such gross unfairness as to deprive defendant of a fair trial or due process of law (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 726).

### d. The First Renewed Motion to Sever (May 11, 1992)

Defendant renewed her motion to sever before Judge Weisberg on May 11, 1992, arguing that since the time Judge Weisberg denied the first severance motion, the defense had learned of new evidence in the form of a recorded polygraph examination and interview with Phillip in which he stated he went to the victim's workplace in hopes of obtaining a loan; there he found the victim and defendant, defendant suddenly produced a gun and killed her husband, and then asked Phillip to dispose of the weapon. In light of the new evidence, defense counsel argued the case fell within "the paradigm definition of antagonistic and mutually incompatible defenses where each defendant is accusing the other and lessens the prosecution's burden." Further, according to counsel, "the problem is that the two defendants find themselves in a position where to acquit one of them the jury must necessarily convict the other."

Judge Weisberg denied the renewed motion, explaining: "[A]s I stated before, it is within the court's discretion, and I considered the matter of inconsistent defenses, and I am exercising my discretion and denying the motion to sever." Although defendant does not provide any argument independently

41

challenging the denial of this renewed motion, we perceive no abuse of discretion; the new evidence does not materially change the adversarial nature of the codefendants' anticipated defenses, and the trial court was already aware that each would attempt to blame the other as the person who pulled the trigger.

### e. The Renewed Motion to Sever Before Judge Trammell (June 8, 1992)

Defendant renewed her motion to sever once again after the case was transferred to Judge Trammell. Judge Trammell reviewed the previous written motions, which had leaned heavily on the argument that defendant and Phillip Sanders would present antagonistic defenses, and then heard argument on the renewed motion. Defense counsel again argued that severance was required because defendant and Phillip Sanders were expected to present antagonistic defenses. But when the prosecutor argued the defense could not identify "one piece of evidence . . . that is going to be admitted in a joint trial that would be inadmissible in a separate trial," defense counsel had no answer.

Judge Trammell denied the renewed severance motion. He acknowledged he had discretion to reconsider the matter, suggested Judge Weisberg would not have abused her discretion had she granted severance and, indeed, said he likely would have granted the original motion, but explained: "I feel it's discretionary and I choose to allow the prior rulings to remain." Asked by defense counsel whether it would be helpful for the defense to file additional briefing on the court's authority to reconsider a ruling by a previous, different judge, Judge Trammell replied, "I don't feel that . . . what I have before me is sufficient to cause me to override [Judge Weisberg's] decisions," and that Judge Weisberg's decision denying severance was not an abuse of discretion.

Defendant argues Judge Trammell misapprehended the scope of his discretion, arguing that no statute precluded reconsideration, and the judge had

42

jurisdiction for all purposes. Further, defendant points to Judge Trammell's use of the word "override" to suggest the judge gave inappropriate deference to Judge Weisberg's initial ruling. The contention cannot be sustained. The record makes clear Judge Trammell understood he had discretion to reconsider the matter. For example, the judge stated specifically that he understood he was not sitting as an appellate court, and that a "motion for renewed consideration per change in circumstance can always be made." He simply found the evidence presented by the defense insufficiently substantial to convince him a change was justified. Indeed, the evidence of inconsistent or antagonistic defenses was only a little changed since the time Judge Weisberg had first denied severance. The decision to deny the renewed motion for severance was thus not arbitrary and capricious. There being no abuse of discretion, we will sustain it on appeal. (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 726.) We also conclude Judge Trammell's denial of the renewed severance motion did not result in such gross unfairness as to deprive defendant of a fair trial or due process of law. (*Ibid*.)

*f. The Fourth Pretrial Severance Motion (June 24, 1992)*

During jury selection on June 24, 1992, defendant once again moved to sever her case from that of codefendant Phillip Sanders. Defense counsel explained that he had become aware that on June 9, 1992, counsel for Phillip made an ex parte presentation to the trial court and that the evidence presented there "might impact the court's decision on the issue of either separate juries for the two defendants or for severance." Although counsel did not know the substance of the ex parte presentation, he cited this new development as the reason for his renewed motion for severance. In the alternative, he moved for the empanelment of dual juries. The trial court denied both motions, saying: "I see no reason for either a severance or two juries to hear the case at the same time. In other words, nothing

43

was revealed in that [ex parte hearing] that would cause me to believe it would be necessary to do that."

As we explain in more detail, *post*, part I.B.3, Phillip's attorneys made an ex parte showing in chambers regarding letters he received from defendant while both were in pretrial detention. The letters urged Phillip to recant his story blaming defendant for the shooting in exchange for promised financial benefits. The prosecution agreed not to press for timely discovery of the letters (and of the authenticating witness, Jennifer Lee), thereby permitting Phillip and the prosecution to delay disclosing the letters to defendant. The trial court was aware of the content of the letters and expressly referred to them (i.e., "nothing was revealed in that [ex parte hearing] that would cause me to believe" severance was required) when denying the renewed severance motion.

We find no abuse of discretion. Subject to authentication, the letters would have been admissible against defendant whether or not she was tried jointly with Phillip. Although defendant suggests her lack of formal notice of the letters (and Lee's role in authenticating them) violated her right to due process, the letters could not have taken defendant by surprise because, having written them (and convinced Lee to recopy some of them), defendant was undoubtedly aware of their existence and contents. She has, moreover, not suggested how earlier disclosure of the letters would have made any difference to her defense. She claims the joint trial risked compromising a specific trial right, but does not identify what right that was. In short, the letters, although not considered by Judge Trammell when he denied the previous severance motion, did not much change the calculus of whether severance was necessary, as he so held. Even were we to find Judge Trammell abused his discretion, no prejudice could have occurred, as defendant was already aware of the letters.

44

When, much later in the trial, the existence of the letters was finally revealed, defendant moved for a continuance, renewed her motion for severance, and then moved for a mistrial, but all three motions were denied. To the extent she now contends the trial court should have granted severance at that time, we reject the claim for the same reason: the trial court acted within its broad discretion because the letters would have been admissible in a separate trial, and defendant was not prejudiced by their belated disclosure.

### g. *Motion for Dual Juries (June 24, 1992)*

Defendant also claims Judge Trammell should have granted her alternative motion for the empanelment of dual juries based on Phillip's counsel's ex parte presentation to the court. This claim requires a somewhat different analysis. We know Judge Trammell was aware of the possibility of using dual juries as an alternative to separate trials because, when denying the prosecution's motion to reconsolidate trial of all four defendants, he stated: "I don't like dual juries. I don't think anyone does, but I think in the interest of judicial economy there are times you have to use them." But when he later denied defendant's motion for dual juries, Judge Trammell explained that "nothing was revealed in that [ex parte hearing] that would cause me to believe it would be necessary to [order dual juries]."

The law is settled. "[W]e have upheld the use of separate juries for jointly tried defendants, as an alternative to outright severance. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1287 . . . .) *Cummings* explained, however, that the decision to use dual juries is largely a discretionary one, and that '[w]hen the trial court's denial of severance and impanelment of dual juries is urged as error on appeal . . . the error is not a basis for reversal of the judgment in the absence of identifiable prejudice or "gross unfairness . . . such as to deprive the defendant of a

45

fair trial or due process of law." [Citations.]' (*People v. Cummings*, *supra*, 4 Cal.4th at p. 1287. . . .)" (*People v. Taylor* (2001) 26 Cal.4th 1155, 1173–1174.)

Defendant fails to demonstrate such gross unfairness. Although she contends "[t]he record contains no evidence that Judge Trammell in fact exercised his discretion, 'guided by legal principles and policies appropriate to the matter at issue,' " we disagree. Defendant's oral motion was based on the revelation that Phillip's counsel and the prosecution conducted an ex parte hearing, excluding defendant and her lawyers. Although defense counsel's motion was somewhat handicapped because he was not privy to the contents of that hearing, Judge Trammell presided over the hearing and expressly ruled that nothing revealed therein justified using dual juries. That ruling was well within the court's discretion and in the absence of a showing of identifiable prejudice or gross unfairness, the denial of separate juries did not deprive defendant of a fair trial or due process of law. (*People v. Cummings*, *supra*, 4 Cal.4th at p. 1287.)

### h. The Renewed Severance Motion  (July 21, 1992)

Just prior to the prosecution's opening statements on July 21, 1992, defendant moved to have the trial court exercise its discretion and order codefendant Phillip Sanders to present his defense first, i.e., after the prosecution rested its case. Counsel argued that if defendant were forced to put on her defense first, she would "be caught between two prosecutors," anticipating Phillip's defense would be that defendant was the actual shooter. Phillip's counsel objected, arguing that disadvantage would exist for whoever went first, and also citing the interest in ensuring the safety of witnesses. (The trial court undoubtedly understood that this was a reference to Jennifer Lee, Phillip's anticipated witness who would authenticate the letters defendant sent Phillip, and who felt threatened

46

by defendant.)  The trial court denied the motion and directed defendant to present her defense before Phillip.

In his opening statement, the prosecutor argued the evidence would show that Phillip Sanders was "the shooter in this case.  The person that actually carried out the assassination."  By contrast, Phillip's counsel argued that defendant was the shooter and had set up the murder so that Phillip was "present when she does in fact shoot Melvin Thompson three times."  After Phillip's counsel concluded his opening statement but before defendant's counsel made his opening statement, defendant renewed her motion for severance, arguing that although the unfairness of the joint trial was previously just a theoretical matter, "now that [Phillip] is on record in front of the jury [as] setting forth a theory untenable even by the prosecution, [defendant] is in the unenviable position [of] defending against not only the prosecution, but against her codefendant."  "She simply cannot defend against these twin evils."  In the alternative, she asked for the empanelment of dual juries.  The trial court denied both motions without comment.

The trial court's denial of the renewed severance motion was not an abuse of discretion.  The same motion had been denied several times before, and the assertions made during the opening statements added little, if anything, to what was previously known.  Absent some critical new evidence, the trial court's decision to stand on its previous ruling was well within its discretion.

Nor did the court abuse its discretion by denying defendant's motion to change the order of proof.  "[T]he order of proof in a criminal case rests in the sound discretion of the trial court" (*People v. McDermand* (1984) 162 Cal.App.3d 770, 792; see § 1093 [specifying the order of proof but providing the trial court retains discretion to alter it]), and the court's concern for the safety of witness Lee provides ample support for its exercise of discretion.  In any event, we see little that could be gained by forcing Phillip to present his evidence first because

47

defendant, having written the letters, must have been aware of their existence and contents.

### *i. Additional Motions for Severance During the Guilt Phase*

Defendant unsuccessfully renewed her motion for severance three more times during the guilt phase of trial. Defendant did so first on August 7, 1992, during the prosecution's case-in-chief against Phillip Sanders, after the trial court sustained Phillip's claim of marital privilege (to keep his wife, Carolyn, from testifying that he had confessed he shot the victim). Defendant argues the court's ruling deprived her of the benefit of Carolyn's statements, which would have provided direct evidence that defendant was not the actual shooter, a key issue when the jury was to weigh the appropriateness of the death penalty at the penalty phase of the trial. Phillip's counsel said he would "absolutely" claim the marital privilege whether or not defendant and Phillip were tried separately. Carolyn Sanders's attorney said he would advise her not to testify in a separate trial against defendant, citing her right against compelled self-incrimination, although defendant's attorney argued that because Carolyn had already waived her rights and given some testimony, she was no longer entitled to invoke her Fifth Amendment rights. Defense counsel then reiterated that "we're entitled to severance to present this very important evidence [i.e., Carolyn's testimony that Phillip admitted being the shooter]." Although the trial court expressed concern about the complexity of the case and ensuring defendant's right to a fair trial, it ultimately denied severance.

Second, on August 14, 1992, codefendant Phillip Sanders disclosed the four letters he had received from defendant. Defendant's counsel made clear he had just received the letters for the first time that morning at 8:15 a.m. Counsel moved for a mistrial and renewed his motion for severance, "because it seems clear to me

48

that we are being asked to defend against material we have never seen and has not been provided to us," and claimed the failure to earlier disclose the evidence violated defendant's right to due process of law. The court denied the motions.

Later, however, when the court and attorneys discussed whether defendant's constitutional right to a fair trial might override Phillip's marital communications evidentiary privilege, *Phillip* moved for severance, apparently thinking he might still be able to assert his marital communication privilege in a separate trial. Given the complexities of the situation, the trial court admitted, "I am now seriously considering severance and mistrial," "I don't think I've any other choice. To [e]nsure Mrs. Thompson a fair trial, I don't have any other choice," and "I'm leaning strongly toward a severance." But despite voicing these misgivings, the court did not issue a ruling at that time.

Next, on August 17, 1992, the court again took up the question of severance. Defense counsel argued that if defendant was unable to impeach Phillip with the statements he made to his wife, then "the only alternative for the court is to grant severance."[7] The prosecutor argued that severance was premature because it was not yet clear defendant would call Carolyn Sanders to the stand. After much back and forth, the trial court denied the renewed severance motion as premature.

---

[7] The premise of the argument was that, were defendant tried separately, she could call Carolyn Sanders to the stand and have her repeat her evidence that Phillip told her he personally shot the victim. That premise is doubtful, as Evidence Code section 980, the statutory privilege for marital communications, provides that a "spouse . . . *whether or not a party*, has a privilege . . . to prevent another from disclosing [a confidential marital communication]." (Italics added.) Thus, Phillip could prevent Carolyn from testifying even if he were not jointly tried with defendant.

49

After a 15-minute break, in what the court described as an "unbelievable" twist, counsel for Phillip announced they had reached an agreement with the prosecution to waive the marital communication privilege (thereby permitting Carolyn Sanders to testify) in exchange for the prosecution's promise not to urge the jury to vote for the death penalty. The prosecution clarified that it intended to proceed to a penalty phase for both defendants, but that the prosecution would simply not urge a death verdict for Phillip.

Defendant made her third midtrial severance motion on August 18, 1992. On that day, Phillip Sanders testified that he had received some letters from defendant and wrote back to her on the advice of his attorneys, who suggested that if he responded she might write more letters and further incriminate herself. Citing that testimony, defense counsel again moved for severance, arguing that he would like to call Phillip's attorneys as rebuttal witnesses but they would likely invoke attorney-client privilege. "Therefore, I believe we have another instance of the inability of [defendant] to confront and cross-examine witnesses against [her]." The court denied the motion with no comment.

Ultimately, Phillip testified he did not tell his wife, Carolyn, that he personally shot the victim. The prosecution declined to impeach him with his wife's testimony, so defendant called her to the stand in rebuttal, where she testified that on the night in question, Phillip came home and told her he shot someone at a transmission shop.

Defendant does not argue the individual merits of the trial court's denials of her three midtrial severance motions, but argues that together those rulings deprived her of her constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as article I,

50

section 15 of the California Constitution.**8**  Although defendant reprises her earlier claims that the repeated denials of severance were an abuse of discretion, her specific constitutional claims are that failure to sever her trial from Phillip's deprived her of a fair trial and a reliable penalty determination because Phillip and his counsel acted as an extra prosecutor.  This allowed Phillip, for example, to delay disclosure of defendant's prison letters and the existence of Jennifer Lee, the authenticating witness.  Defendant also suggests that had she been granted a separate trial, Phillip would never have reached a deal with the prosecution, and so would not have testified at her separate trial due to concerns of self-incrimination, which in turn would have eliminated the need for her to call Carolyn Sanders to the stand to impeach him.  In a separate trial, she suggests, if Phillip chose to testify, his credibility would have been compromised by having to admit he was an accomplice as a matter of law.

None of these arguments convinces us that any of the trial court's rulings denying severance, either alone or in combination, resulted in a violation of defendant's state or federal constitutional rights.  With regard to the delayed disclosure of the jail letters and Jennifer Lee's testimony, we have already explained that no harm came from the delay because defendant was undoubtedly aware of evidence of letters she herself had composed, despite the absence of formal discovery.  Further, the trial court offered to recall Lee to the stand should defendant wish to conduct a further cross-examination of her, but defendant did not take advantage of this opportunity, suggesting that advance warning of Lee's

---

**8**    As pertinent here, article I, section 15 of the California Constitution states: "The defendant in a criminal case has the right to . . . be confronted with the witnesses against the defendant," and that "[p]ersons may not . . . be deprived of life, liberty, or property without due process of law."

testimony would have made little or no difference to defendant's approach to the trial.

Defendant suggests she was disadvantaged when the prosecution chose not to call Carolyn Sanders to testify because that decision forced defendant to call her to the stand to rebut Phillip's testimony that defendant shot the victim. Defendant exaggerates the deleterious effect of that decision because no matter who called Carolyn to the stand, her testimony provided strong evidence that Phillip, not defendant, was the actual killer. Moreover, although defendant suggests a severance would have better protected her rights, she would have fared no better had severance been granted. Even in a hypothetical separate trial, she would have attempted to shift the blame for the murder to Phillip and to this end would have tried to call Carolyn Sanders to testify. Had Phillip never reached a deal with the prosecution to waive his marital communication privilege, he could have prevented Carolyn from taking the stand in a hypothetical separate trial. But in that case, the prosecution would also never have agreed to refrain from calling Juanita Williams to the stand, something it did in order to preserve a joint trial. Williams would then have repeated Phillip's incriminating statements to her, statements which were clearly against his penal interests and thus admissible despite the hearsay rule. We thus cannot say defendant was disadvantaged by the denial of her severance motion. In any event, "[s]imply because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair." (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 379.)

Regarding defendant's contention that failure to sever violated her right to a fair trial because joinder allowed Phillip to act as a second prosecutor, we have recently rejected that precise argument, reasoning that "important concerns of public policy are served if a single jury is given a full and fair overview of the

52

defendants' joint conduct and the assertions they make to defend against ensuing charges." (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 379.) Although the prosecution's cooperation with Phillip and his counsel was unusual, none of the agreements reached by the prosecution to maintain a joint trial rendered defendant's trial so unfair that we could conclude defendant's confrontation or fair trial rights were violated.

### j. Conclusion

We thus conclude the denials of defendant's many severance motions, both alone and in combination, fell within the court's discretion and did not deprive defendant of a fair trial. Moreover, even were we to conclude the trial court abused its discretion in denying severance, the evidence of defendant's guilt was overwhelming, including her many financial frauds indicating her motive, her lies about recycling and about the Rolex watch, her many telephone calls to Phillip leading up to the murder, her blurted-out statements indicating guilt (i.e., that she "didn't mean for it to happen this way," and that she "didn't know Phil at all"), and especially Christine Kuretich's testimony concerning the planning of the crime. Consequently, those rulings did not prejudice defendant or otherwise result in an unfair trial.

### 3. Denial of Reciprocal Discovery

Defendant argues the trial court's failure to order discovery from her codefendant, Phillip Sanders, violated her state and federal constitutional rights to a fair trial, to due process, to present a defense, to confront the witnesses against her, and to a reliable death penalty verdict (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, § 15), as well as her rights under section 1054 governing discovery in criminal cases. As explained below, we reach the following three conclusions: Section 1054 does not require a court to order one

53

codefendant to provide discovery to another codefendant; the trial court's failure to order such discovery did not violate defendant's state or federal constitutional rights; and; assuming error occurred, it was harmless.

### a. Facts

After defendant rested her defense, codefendant Phillip Sanders was scheduled to begin his defense to the charges. As part of his defense, he intended to introduce letters, sent to him by defendant while both were in pretrial custody, urging him not to trust his lawyer and promising financial rewards were he to change his story blaming her for the murder. (One letter was handwritten by defendant herself, but the others were copied by her cellmate from letters defendant provided.) Around this time (i.e., midtrial), the prosecution for the first time formally received copies of the letters from Phillip's counsel and thereafter disclosed them to defendant's attorney, who protested the belated disclosure of the evidence.

In fact, the prosecution had learned much earlier both that Phillip possessed the letters and that he intended to introduce them as evidence. Two months earlier, on June 9, 1992, Phillip's two attorneys, Cary Weiss and David Wesley, along with the prosecutor, held an ex parte meeting before Judge Trammell, during which the attorneys revealed the existence of the letters and informed the prosecutor they had located a witness (defendant's former cellmate, Jennifer Lee) who could authenticate them. Weiss and Wesley asserted they did not want to formally disclose the evidence to the prosecutor because that would trigger the latter's obligation under applicable discovery rules to disclose the evidence to defendant. Wesley acknowledged he would have to provide discovery to the prosecution at some point but, as a strategic matter, wished to wait until after defendant had presented her defense and "locked herself into a position." Wesley

54

explained that Lee, the authenticating witness, was afraid defendant would retaliate violently against her should she discover Lee had cooperated with the prosecution. Wesley echoed Lee's concern that Lee's safety in jail would be compromised if defendant had advance knowledge that Phillip intended to use the letters. The prosecution agreed not to press for disclosure at that time. The trial court agreed that Phillip's attorneys would not have to disclose Lee's existence until after defendant testified.

At a later ex parte hearing on July 27, 1992, the trial court approved Phillip's agreement with the prosecution not to disclose the evidence until trial. The prosecution, in effect, declined to insist on its right to pretrial discovery. Indeed, the agreement between Phillip and the prosecution went so far as to permit Phillip's counsel to submit the letters to the Los Angeles Police Department's handwriting expert to permit analysis, with a court order directing the expert not to disclose the letters without the court's permission. When the codefendant's possession of the letters was finally revealed, defendant moved for a continuance, renewed her motion for severance, and then moved for a mistrial, but all three motions were denied. The trial court ordered the prosecution to disclose to defendant's attorneys the copies they had in their possession.

Phillip's defense began on August 17, 1992. Although defendant would later stipulate that she wrote one of the letters, she objected to the introduction of the letters not in her own handwriting, arguing they had not been properly authenticated. The trial court ruled that Phillip could not discuss the content of those letters until they were authenticated, but later denied defendant's further motion for production of the actual letters as well as her request for a list of the witnesses Phillip intended to call, explaining, "I don't believe I have the right to order that because it's a codefendant and the discovery statute doesn't address that issue." Phillip later testified and admitted receiving the letters but denied

55

accepting any financial benefits from defendant in exchange for changing his testimony. Instead, Phillip said he turned the letters over to his lawyers. Jennifer Lee testified and authenticated the letters, explaining that she copied the letters as a favor to defendant. Lee also testified that defendant and Phillip's wife, Carolyn, were friends at county jail, that defendant told her she was on a cruise when her husband was killed, and that she (defendant) had a lot of money, owned a yacht, and lived in Calabasas. Outside the presence of the jury, defendant unsuccessfully renewed her motion for a mistrial due to the failure to provide discovery.

In closing argument, both the prosecution and Phillip relied on the letters. The prosecutor emphasized the letters were powerful evidence that defendant and Phillip were working together, noting that the letters showed they discussed their common defenses and strategies, that they "clearly show a conspiracy," and that "[i]t's obvious there is no animosity between any of these people" and Phillip's counsel, in turn, argued the letters were "the best evidence of what is really going on in somebody's mind" and they show that defendant was "afraid that [Phillip] is going to admit to getting rid of this gun and tell everything that happened." According to Phillip's counsel, another letter showed that Carolyn Sanders and defendant had decided Phillip should take the blame for the killing and "lays out a story for him to tell" that would allow the two women to avoid prison. In return for Phillip presenting such evidence exculpating Carolyn and defendant, according to the letter, defendant promised "to take care of him and [Carolyn] for the rest of your lives."

### b. Section 1054

Discovery in criminal cases is governed by section 1054, which was added to the Penal Code by Proposition 115 in 1990. " 'Proposition 115 added both constitutional and statutory language authorizing reciprocal discovery in criminal

56

cases.' The new constitutional provision, article I, section 30, subdivision (c) of the California Constitution, declares that '[i]n order to provide for fair and speedy trials, discovery in criminal cases shall be reciprocal in nature, as prescribed by the Legislature or by the People through the initiative process.' " (*Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1102, superseded by statute on another ground, as stated in *People v. Banks* (2014) 59 Cal.4th 1113, 1193.) "The same proposition also added chapter 10 to part 2, title 6 of the Penal Code, commencing with section 1054 . . . , establishing the procedures for, and limitations on, discovery in criminal cases. Section 1054 sets forth the purposes of this new chapter, including that 'no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States.' (*Id*., subd. (e).) We have emphasized this statutory exclusivity, noting that 'all court-ordered discovery is governed exclusively by—and is barred except as provided by—the discovery chapter newly enacted by Proposition 115.' (*In re Littlefield* (1993) 5 Cal.4th 122, 129.)" (*Verdin*, *supra*, at pp. 1102–1103.)[9]

---

[9] Section 1054, in full, states: "This chapter shall be interpreted to give effect to all of the following purposes:

" (a) To promote the ascertainment of truth in trials by requiring timely pretrial discovery.

" (b) To save court time by requiring that discovery be conducted informally between and among the parties before judicial enforcement is requested.

" (c) To save court time in trial and avoid the necessity for frequent interruptions and postponements.

" (d) To protect victims and witnesses from danger, harassment, and undue delay of the proceedings.

" (e) To provide that no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States."

As defendant acknowledges, and the trial court held, no provision in the statutory scheme governing criminal discovery explicitly or even impliedly requires one codefendant to disclose any evidence to another codefendant. Thus, section 1054.1 states that "[t]he *prosecuting attorney* shall disclose *to the defendant* or his or her attorney all of the following materials and information . . . ." (Italics added.) Similarly, section 1054.3, subdivision (a) requires a "*defendant* and his or her attorney [to] disclose *to the prosecuting attorney*" certain materials. (Italics added.) Nothing in the language of these two provisions requires one codefendant to provide discovery to another codefendant. We have adhered strictly to this language; for example, we held in *People v. Ervin* (2000) 22 Cal.4th 48, that although reciprocal discovery of penalty phase evidence between a defendant and the prosecution is generally required by section 1054, "no statutory basis exists for the discovery of codefendants' penalty phase witnesses" (*Ervin*, *supra*, at p. 101).

Despite the absence of express authority requiring discovery among codefendants, defendant argues that, having decided early on to have Jennifer Lee testify to authenticate the letters, Phillip was required to provide discovery of that fact to the prosecution, which would in turn have required the prosecution to disclose that information to defendant. But the prosecution, made aware of the evidence, expressly acquiesced in Phillip's proposal to delay disclosure. Nothing in the statutory scheme prohibits the prosecution from doing so.

Noting that section 1054.7 provides that discovery "shall be made at least 30 days prior to the trial, unless *good cause is shown* why a disclosure should be denied, restricted, or deferred" (italics added), defendant further argues the trial court abused its discretion by permitting deferral of disclosure without first making a finding of good cause. But the quoted language, read in context, clearly addresses the trial court's discretion in cases where discovery is otherwise

required.  Because we find the statutory scheme beginning with section 1054 does not require discovery between codefendants, the good cause provision is beside the point.  But even if a showing of good cause were required to defer discovery, such cause was shown by Lee's expressed fear of retaliation should defendant learn of Lee's cooperation with the prosecution.  (§ 1054.7 [good cause includes evidence of "threats or possible danger to the safety of a . . . witness"].)  Defendant does not, even now, suggest these concerns over Lee's safety were fabricated or exaggerated.

Defendant also contends language in section 1054, subdivision (b) can be read to require mandatory discovery between codefendants.  That section sets forth the general purposes of the criminal discovery scheme and states in part that discovery is required "[t]o save court time by requiring that discovery be conducted informally *between and among the parties* before judicial enforcement is requested."  (Italics added.)  According to defendant, by using the words "between" and "among" in this passage, the drafters of the statute "make[] clear they intended the reciprocal discovery rules to apply to all those involved in a criminal case as 'parties.' "  While defendant's reading is plausible as a general matter, inferences drawn from the definitions of the words "between" and "among" cannot overcome the more specific provisions in sections 1054.1 and 1054.3 that speak in terms of discovery flowing specifically from the "prosecuting attorney" to the "defendant" (or his or her attorney), and vice versa.  Moreover, as is clear from the context of section 1054, subdivision (b), that provision merely expresses the Legislature's general intent that parties first attempt to obtain discovery informally, "before judicial enforcement is requested."  We cannot reasonably infer from either the language or the context of this passage that the Legislature intended to authorize reciprocal discovery between codefendants being jointly tried.

59

### c. Constitutional Considerations

Having concluded no statutory basis exists for requiring a criminal defendant to provide discovery to a codefendant in a joint trial, we now turn to whether defendant was entitled to discovery of the letters as a constitutional matter. Although section 1054, subdivision (e) sets forth a strict rule limiting the availability of discovery in criminal cases ("no discovery shall occur in criminal cases except as provided by this chapter"), it also acknowledges two key exceptions: discovery is available if required by "other express statutory provisions, or as mandated by the Constitution of the United States." We have previously recognized that discovery in criminal cases is sometimes compelled by constitutional guarantees to ensure an accused receives a fair trial. (See, e.g., *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696 [requiring disclosure of potentially impeaching material contained in a law enforcement officer's personnel file]; *People v. Gonzalez* (2006) 38 Cal.4th 932 [requiring disclosure of the prosecution's rebuttal witnesses at the penalty phase of a capital trial]; *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121 [requiring disclosure of the identities of crucial prosecution witnesses].) In such cases, we have "reaffirmed that a criminal defendant's right to discovery is based on the fundamental proposition that the accused is entitled to a fair trial and the opportunity to present an intelligent defense in light of all relevant and reasonably accessible information." (*People v. Hobbs* (1994) 7 Cal.4th 948, 965.)

Defendant argues Phillip's failure to disclose the letters and Lee's identity as an authenticating witness, as well as the failure to disclose the prosecution's agreement to forgo insisting on its statutory right to discovery of the material, violated her constitutional rights under both the Sixth Amendment (to confront the witnesses against her) and the Fourteenth Amendment (her due process right to a fair trial and to a meaningful opportunity to present a defense). But although

60

defendant, as one accused of serious crimes, was unquestionably entitled to the right to confrontation and to a fair trial, she does not explain how her codefendant's failure to provide her with pretrial disclosure of the letters and of Lee's expected testimony denied her the rights guaranteed by the United States Constitution.[10]  Defendant presumably knew the content of the letters (because she wrote them) and knew of Lee's participation as well, so she could not have been caught off guard to such an extent that we might conclude she was unable to prepare a meaningful defense and thereby denied her due process right to a fair trial.  She was, moreover, able to cross-examine Phillip and Lee about the letters, thereby satisfying her right to confrontation.  Under the circumstances, we conclude the trial court's decision to permit Phillip to pursue a trial strategy disadvantageous to defendant Thompson did not violate her constitutional rights.

To the extent defendant asserts the decision to hold a joint trial and the denial of her many motions for severance deprived her of notice and the timely discovery of evidence she would have otherwise received in a separate trial, she fails to establish the failure to provide her with discovery of the letters before trial violated her constitutional rights.  As we explained in *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at page 379, "[s]imply because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair.  [Citation.]  Indeed, important concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against ensuing charges."  Accordingly, the mere possibility she would have

---

[10]     Although defendant's opening brief also contends the denial of discovery denied her state constitutional rights under article I, section 15 of the California Constitution, she provides no separate discussion or analysis of that provision.

61

obtained discovery of the letters earlier had she been tried separately is insufficient to demonstrate a violation of her constitutional rights to a fair trial and to confront the witnesses against her. Although defendant is correct that we strive to interpret statutes (such as § 1054) so as to avoid constitutional problems (see *In re Marriage Cases* (2008) 43 Cal.4th 757, 800), because we find defendant had no constitutional right to discovery from her codefendant, we have no occasion to reinterpret section 1054 to require reciprocal discovery among codefendants.

### d. Prejudice

Finally, even were we to find defendant was entitled, either by statutory or constitutional compulsion, to earlier discovery of the letters and of Lee's identity, we would conclude any error was harmless under any standard. Because defendant wrote the letters, and personally asked Jennifer Lee to copy them in her own handwriting before sending them to Phillip, defendant was undoubtedly aware of both the existence of the evidence and its potential significance, and she had sufficient opportunity to fairly meet the evidence when it was presented to the jury. For example, defendant failed to take advantage of the trial court's offer to have Lee return to the stand to allow defendant to cross-examine her on the circumstances of her purported authentication of the letters. Under the circumstances, defendant could not have suffered any prejudice from her inability to obtain discovery at an earlier time from her codefendant.

### 4. Ex Parte Hearings

Related to her claim that she was entitled to pretrial discovery from her codefendant, Phillip Sanders, of evidence concerning the jail letters, defendant also contends she was entitled to be present at the hearings in which Phillip's attorneys, the prosecutor and the trial court discussed the discovery issue. Her exclusion from these hearings, she claims, violated her constitutional rights to

62

counsel and to due process of law under the state and federal Constitutions.  (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.)  She also contends her exclusion from these hearings violated her statutory right to be present at all critical stages of her criminal trial (§§ 977, 1043), and that holding an ex parte hearing was unauthorized by section 1054.7, violated the California Code of Judicial Ethics (hereafter Code of Judicial Ethics), and deprived her of the effective assistance of counsel.  For the reasons that follow, we reject these claims.[11]

### *a.  The Constitutional Right to Be Present*

" 'Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination."  [Citations.]  Due process guarantees the right to be present at any "stage . . . that is critical to [the] outcome" and where the defendant's "presence would contribute to the fairness of the procedure." '  [Citation.]  The state constitutional right to be present at trial, which is guaranteed by article I of the California Constitution, ' "is generally coextensive with the federal due process right." ' "  (*People v.*

---

[11]    Defendant also mentions, but provides no independent argument regarding, an ex parte hearing held early in the pretrial period for the purpose of appointing separate counsel for witness Christine Kuretich, a housemate of Phillip and Carolyn Sanders, who was expected to be called as a prosecution witness.  Defendant makes just a bare mention that an ex parte hearing was held concerning Kuretich, does not describe what happened in the hearing, and then devotes her entire briefing on the question of ex parte hearings to the set of hearings involving Phillip's desire not to provide discovery to defendant.  The Attorney General does not mention the Kuretich hearing at all.  On appeal, we assume a judgment is correct and the defendant bears the burden of demonstrating otherwise.  (*People v. Garza* (2005) 35 Cal.4th 866, 881; *People v. Cardenas* (2015) 239 Cal.App.4th 220, 227.)  Under the circumstances, we find defendant has not met her burden of showing statutory or constitutional error with regard to the Kuretich hearing.

*Cunningham* (2015) 61 Cal.4th 609, 633.) Defendant contends that her right to due process and a fair trial required the trial court to have given her notice and an opportunity to be heard on the questions of her alleged right to discovery from Phillip. In short, she claims the trial court should not have held the hearings without her.

"Proceedings held in chambers and outside the presence of a party are generally disfavored." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1299.) Nevertheless, as a general rule, a trial court has discretion to conduct a proceeding in a defendant's absence "to protect an overriding interest that favors confidentiality." (*Ibid.*; see *People v. Valdez* (2012) 55 Cal.4th 82, 125 ["ex parte proceedings are permissible if 'compelling reasons justify them' "].) Unlike most instances in which a criminal defendant complains of being excluded from a hearing, the ex parte hearing in this case excluded both defendant and her attorneys. We need not decide whether the same rules apply in that situation, however, because we conclude any constitutional error was harmless. As explained, *ante*, the subject of the ex parte hearings now challenged concerned the letters defendant sent to Phillip Sanders in jail, and Jennifer Lee's ability to authenticate those letters. Defendant could not have been taken by surprise by the contents of the letters because she wrote them. She was, moreover, afforded sufficient opportunity to cross-examine Lee regarding her role as defendant's amanuensis. Accordingly, the exclusion of defendant and her attorneys from the hearing in question could not have prejudiced her under any standard.

### b. The Statutory Right to Be Present

Defendant also argues her exclusion from the hearing on Phillip Sanders's discovery obligations violated her statutory rights. With exceptions not relevant here, at the time of defendant's trial section 977 provided in pertinent part: "In all

64

cases in which a felony is charged, the accused [shall be personally] present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence.  The accused must be present at all other proceedings unless he shall, with leave of court, execute in open court, a written waiver of his right to be personally present, approved by his counsel, which waiver must then be filed with the court . . . ."  (Former § 977, subd. (b), as amended by Stats. 1968, ch. 1064, § 1, p. 2064.)  The present version of the statute, section 977, subdivision (b)(1), is essentially the same.  (See Stats. 2014, ch. 167, § 1.)

Section 1043 is also relevant.  It provides that a felony defendant "shall be personally present at the trial" (*id.*, subd. (a)), provides for removal of disruptive defendants (*id.*, subd. (b)(1)), and when read together with section 977, provides that "a capital defendant cannot voluntarily waive his right to be present during the proceedings listed in section 977."  (*People v. Cunningham*, *supra*, 61 Cal.4th at p. 635.)  In other words, section 1043 when read in conjunction with section 977, permits a capital defendant to be absent only in very limited circumstances (*People v. Brown* (2014) 59 Cal.4th 86, 117–118).

Like the constitutional imperative, the statutory requirement that a criminally accused be personally present in court applies to all proceedings where his presence bears a " ' "reasonable, substantial relation to his opportunity to defend the charges against him." ' "  (*People v. Carrasco* (2014) 59 Cal.4th 924, 959, quoting *People v. Lynch* (2010) 50 Cal.4th 693, 745–746.)  But as with the constitutional claim, we need not decide whether the ex parte hearing now challenged satisfies the "reasonable, substantial relation test," because no prejudice could have resulted from the exclusion of defendant and her attorneys from the hearing.  Again, as defendant was undoubtedly aware of the existence

65

and contents of the letters, as well as Jennifer Lee's part in copying them, defendant's exclusion from the hearing could not have negatively affected her trial or trial strategy in any meaningful way.

### c. Subsidiary Claims

Defendant makes three subsidiary claims. First, she argues that by holding an ex parte hearing concerning Phillip's discovery obligations the trial court erred under state law, because section 1054.7 does not authorize ex parte hearings. We find no violation of the statute. Section 1054.7 contains no express prohibition on ex parte hearings, and defendant acknowledges that "the trial court may hold an ex parte hearing on a discovery matter" so long as "the hearing . . . comport[s] with the general principles of due process." (Cf. *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 466 ["In general, a court 'has inherent discretion to conduct in camera hearings to determine objections to disclosure based on asserted privileges.' "].) As defendant had no due process right to pretrial discovery from a jointly tried codefendant, the trial court's decision to hold an ex parte hearing was permissible. Nor does *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118, which defendant cites in support, alter our conclusion. The propriety of the ex parte hearing in that case concerned the defendant's request for discovery from the prosecution. By contrast, the discovery matter at issue here was between the prosecution and Phillip, so the case is inapposite. In any event, the court in *City of Alhambra* acknowledged that "ex parte hearings may be necessary to protect a defendant's rights" (*id.* at p. 1130); here, the fair trial rights to be protected belonged to codefendant Phillip Sanders.

Second, defendant argues she is entitled to relief because, by holding an ex parte hearing on Phillip's discovery issue, the trial judge violated the Code of Judicial Ethics. The Code of Judicial Ethics sets forth ethical rules applicable to

judges, and one of them addresses ex parte communications: "A judge shall not initiate, permit, or consider ex parte communications, that is, communications to or from the judge outside the presence of the parties concerning a pending . . . proceeding . . . except [listing situations inapplicable here]." (Code Jud. Ethics, canon 3B(7).) Further, "[i]f a judge receives an unauthorized ex parte communication, the judge shall make provision promptly to notify the parties of the substance of the communication and provide the parties with an opportunity to respond." (*Id*., canon 3B(7)(d) (canon 3B(7)(d)).)

Defendant contends the trial court's ex parte hearing in her case violated this canon, requiring reversal of her convictions. Misconduct by a trial judge may, of course, be grounds for reversal of a judgment, but even were we to assume the trial court was in violation of an ethical rule, reversal would not be required on these facts. As respondent observes, no case authority holds that a violation of a judicial ethical rule, per se, automatically requires reversal of the ensuing judgment. Defendant cites two cases in support, but neither justifies reversal here. In *Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, the trial court viewed the defendant corporation's training video without plaintiff's counsel being present, an apparent violation of canon 3B(7)(d), convincing the appellate court to reverse the resulting judgment. But the *Haluck* court also explained that the procedure was improper because it created an appearance of impropriety, and its decision to reverse was due to a combination of the trial court's multiple ethically questionable acts, not just a single violation of the Code of Judicial Ethics. By contrast, the ex parte hearing in this case was designed to address Phillip's discovery obligations, and only tangentially and minimally affected defendant's rights.

Similarly, in *People v. Bradford* (2007) 154 Cal.App.4th 1390, which defendant also cites in support, the court reversed a conviction due to the trial

court's ex parte communications with a deliberating jury.  Although such misconduct violates the Code of Judicial Ethics, the *Bradford* court reversed the judgment because the ex parte contacts violated the defendant's constitutional right to a fair trial.  By contrast, defendant does not show the ex parte hearing in this case violated her constitutional rights.

In any event, as we have concluded the trial court acted properly in excluding defendant and her attorneys from the hearing in which the prosecution and attorneys for codefendant Phillip Sanders discussed his discovery obligations, defendant was not a "person who [had] a legal interest in the proceeding" within the meaning of canon 3B(7)(d).

Finally, defendant argues that deciding Phillip's discovery matter in an ex parte hearing violated her right to the effective assistance of counsel as guaranteed under the Sixth Amendment to the United States Constitution.  The claim fails because she does not demonstrate she had a right to be represented by counsel at a hearing concerning Phillip's discovery obligations.  Even if she did, no prejudice is apparent, as she could not have been unaware of the contents of the letters under discussion.  (See *People v. Lucas* (2014) 60 Cal.4th 153, 305 ["If petitioner fails to show prejudice, a reviewing court may reject the claim [of ineffective assistance of counsel] without determining whether counsel's performance was adequate"].)

### 5. *Alleged Prosecutorial Failure to Comply with Discovery*

Defendant next contends the prosecution failed to disclose before trial four pieces of evidence, thereby violating the statutory scheme governing prosecutorial discovery (§1054.1 et seq.), as well as her constitutional rights to confrontation, effective counsel, and a reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  As we explain, we find no reversible error.

### a. The Applicable Law

As noted, *ante*, the rules governing discovery in criminal trials underwent a major change on June 5, 1990, by the adoption of Proposition 115, titled the "Crime Victims Justice Reform Act." (See *Izazaga v. Superior Court* (1991) 54 Cal.3d 356.) As defendant's trial was held in 1992, these new rules applied to her trial. Pursuant to those rules, "[i]n criminal proceedings, under the reciprocal discovery provisions of section 1054 et seq., all court-ordered discovery is governed exclusively by—and is barred except as provided by—the discovery chapter newly enacted by Proposition 115 [§§ 1054–1054.7].)." (*In re Littlefield, supra,* 5 Cal.4th at p. 129.)

Section 1054.1 provides: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] . . . [¶] "(f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case . . . ." Such disclosures must "be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred." (§ 1054.7.) " 'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement." (*Ibid.*)

Although section 1054.1, subdivision (f) states expressly that the prosecution must disclose "written or recorded statements of witnesses," at least one appellate court has interpreted this language to apply to oral statements as well. (*Roland v. Superior Court* (2004) 124 Cal.App.4th 154.) We previously have had no occasion to decide whether section 1054.1's disclosure obligation

applies to oral statements in addition to written ones. (See *People v. Verdugo* (2010) 50 Cal.4th 263, 283.)

### b. Analysis

Carolyn Thompson Jones (Carolyn Jones), the victim's eldest child, testified she worked for the United States Department of Defense as an investigator and had had four weeks of training on subjects such as "observing a person's body language, their tone of voice, facial expressions and things like that." She was at the hospital after her father was shot and observed defendant there. Jones testified that defendant "appeared to be very calm at times and then there were other times where she would . . . scream or let out a yell like she was really grieving my father's death; but there were never any tears and she only did that when someone was watching her or looking at her but she was never crying, actually crying, like the rest of us were." This evidence tended to bolster the prosecution's assertion that defendant's expressions of grief were feigned, thus indicating a guilty state of mind.

Defendant objected to Carolyn Jones's testimony on the ground that the prosecution failed to disclose that it intended to call Jones as an expert witness, but the court overruled the objection. Defendant now contends the failure to provide pretrial discovery of Jones's testimony as required by statute violated her constitutional rights entitling her to reversal of her conviction. Respondent notes that defendant's true argument seems more aimed at whether the prosecution gave sufficient notice that Jones would testify *as an expert*, but setting that aside, for two reasons we conclude that, even assuming for argument's sake a statutory discovery violation occurred, reversal is unjustified.

First, when allegedly first confronted with Carolyn Jones's testimony at trial with no previous pretrial discovery, defendant failed to request a continuance

70

to meet the new evidence. This omission is fatal to her contention on appeal. "It is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm." (*People v. Pinholster* (1992) 1 Cal.4th 865, 941; see *People v. Carpenter* (1997) 15 Cal.4th 312, 386–387 [quoting *Pinholster* with approval].) Even now she fails to assert how earlier disclosure of Jones's testimony would have made any difference to her defense strategy. Second, any error was harmless, for Jones was not the only one to notice defendant's lack of true grief. Tommy Thompson, another of the victim's children, testified that when he saw defendant at the hospital, "she didn't show any emotions at all" and "didn't cry at all." According to Tommy, defendant was more grief stricken when her pet cat died. And Nancy Rankin testified that when she rode home from the hospital with defendant, she heard defendant say, "it wasn't supposed to happen this way." Accordingly, any discovery violation with regard to Jones's testimony was harmless under any standard.

Defendant also contends reversal is required because she received no pretrial discovery of Tony DeGreef's testimony. DeGreef testified he met with defendant and Isabelle Sanders when negotiating to sell the Hillary Drive house back to defendant, and that defendant told him that her husband "was very ill to the point of being bedridden in some cases, and it would be much better that I did not speak with him because she did not want to get him more upset in regards to the matter." In short, defendant "indicated that she did not want [the victim] to know" about the negotiations to buy back the house. Defense counsel objected and moved for a mistrial, arguing, "we have absolutely no discovery" of DeGreef's statements. The prosecutor confirmed for the trial court that "everything that has been reduced to writing with respect to this witness [had] been turned over" to the defense, and that defendant had known all along the

71

prosecution intended to prove the victim was ignorant of the foreclosure on the Hillary Drive house. Further, said the prosecutor, "We can't [provide pretrial discovery for] each and every sentence that the witness is testifying to." The trial court denied the mistrial motion.

Even assuming for the sake of argument that some of DeGreef's oral statements that were never reduced to writing were nevertheless subject to pretrial disclosure under sections 1054.1 et seq., defendant's failure to request a continuance defeats her present claim. (*People v. Pinholster*, *supra*, 1 Cal.4th at p. 941.) As with Carolyn Jones's testimony, defendant does not explain how earlier disclosure of DeGreef's oral statements would have made any difference to her defense strategy. Second, any error was harmless, for the enormous web of circumstantial evidence of defendant's financial dealings, including forging the victim's signature on a deed of trust, failing to make payments and allowing the Hillary Drive house to fall into foreclosure, negotiating to rent the house back from BID Properties and then to buy the house back, all strongly suggest the victim was unaware he no longer owned his own home. Accordingly, any discovery violation with regard to DeGreef's testimony was harmless under any standard.

Defendant's final two instances of alleged discovery violations require less comment. Defendant objected that she had no pretrial disclosure that Tommy Thompson, the victim's son, would testify and describe her apparent grief over the death of her pet cat. The prosecutor explained she had just learned that information from a witness during trial, and "I don't think it's fair to require us to run to [the defense] every time we hear a sentence." The trial court denied the implied motion for discovery sanctions, explaining: "The sanction of not letting it in, I'm not going to exercise my discretion at this point because I don't think that a

72

half hour or hour lapse had affected [the] trial or [the defense] preparation." We perceive no error.

Finally, defendant complains she had no pretrial discovery regarding Jennifer Lee, who authenticated letters defendant sent to Phillip Sanders while in pretrial detention awaiting trial. Lee was not a prosecution witness, but was called to the stand by Phillip Sanders. As we explain in more detail, *ante*, parts I.B.3 and 4, no discovery obligation exists as between codefendants being jointly tried. Having found no reversible error for any of the four alleged discovery violations, we have no occasion to decide whether section 1054.1 et seq. apply to oral statements (see *People v. Verdugo, supra*, 50 Cal.4th at p. 283), and also reject the associated claims of constitutional error.

### 6. *Failure to Compel Discovery of Christine Kuretich's Address*

Defendant contends the trial court committed prejudicial error under the applicable statutory rules (§ 1054 et seq.) by denying her motion to compel discovery of witness Christine Kuretich's address. Defendant also contends the court's ruling violated her federal constitutional rights to confront and cross-examine Kuretich, to the effective assistance of counsel, and to a reliable penalty determination. (U.S. Const., 6th, 8th & 14th Amends.) We reject these arguments.

That Kuretich was expected to be a key prosecution witness is undisputed. Section 1054.1 provides that "[t]he prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information . . . [¶] (a) The names and addresses of persons the prosecutor intends to call as witnesses at trial." That discovery obligation is qualified, however, by section 1054.7, which authorizes a trial court to deny, restrict or defer such disclosure on a showing of good cause. (*Alvarado v. Superior Court*, *supra*, 23 Cal.4th at

73

p. 1134.) "We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard." (*People v. Ayala* (2000) 23 Cal.4th 225, 299; see *People v. Curl* (2009) 46 Cal.4th 339, 357 [quoting *Ayala* with approval].) The proper exercise of a trial court's discretion under section 1054.7 does not violate a criminal defendant's confrontation or due process rights. (*Alvarado*, *supra*, at pp. 1134–1135.)

Christine Kuretich testified at the preliminary hearing that she lived with Phillip and Carolyn Sanders around the time of the murder and that she overheard them, along with Robert Jones, make incriminating statements suggesting they were in a conspiracy with defendant to kill the victim. For example, she testified that Carolyn asked her if she knew anyone who would kill someone for money, that the intended victim was defendant's husband, that the motive was to obtain life insurance proceeds, that Phillip would shoot the victim, and that Robert Jones would obtain the gun and drive Phillip to the victim's shop. After testifying at the preliminary hearing, Kuretich left the jurisdiction. The prosecution eventually located her in Kansas, where she had turned her life around. She had stopped doing drugs and drinking, was married and pregnant, and had made plans to buy some land and start a business with her husband. She was brought back to Los Angeles on a material witness warrant and then released to the custody of her parents. The trial court ordered the prosecution to disclose Kuretich's address in Kansas to defendant's attorneys, subject to a protection order that the address not be revealed to defendant. Defense counsel also sought disclosure of Kuretich's current location, i.e., her parents' address. Counsel argued he wanted to investigate whether the witness's claim of newfound sobriety was true. The prosecution objected that intrusive inquiries by the defense might cause Kuretich to again flee the jurisdiction.

74

The trial court suggested a compromise, asking whether it would satisfy the defense if Kuretich was "made available in your office for an interview." Defense counsel Wager replied, "Certainly," adding that he would also like to interview Kuretich's parents. The prosecution had no objection to this arrangement, so the trial court ordered the prosecution to make Kuretich and her parents available for an interview. There was no further defense objection.

Because defense counsel accepted the trial court's compromise, the court did not abuse its discretion when it declined to order disclosure of Kuretich's parents' address. We thus find no statutory or constitutional error. To the extent defendant argues the trial court's ruling compromised her ability to obtain the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution, we reject that claim as well, because defense counsel's decision to accept the trial court's compromise appears on this record to be a reasonable tactical decision that did not fall below prevailing professional norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Gamache* (2010) 48 Cal.4th 347, 391.)

### 7. *Coconspirator Exception to the Hearsay Rule*

Christine Kuretich testified at trial that she had overheard Phillip and Carolyn Sanders and Robert Jones make several inculpatory statements. Prior to trial, defendant had moved to exclude the evidence as inadmissible hearsay but the trial court partially denied the motion, ruling most of the evidence was admissible under the hearsay exception for admissions by coconspirators. (Evid. Code, § 1223.) Defendant now contends the trial court erred prejudicially because the prosecution failed to present sufficient evidence the statements were made during a time when the conspiracy was ongoing, and the evidence therefore did not qualify under the exception for statements by coconspirators. In addition to

75

violating Evidence Code section 1223, defendant also contends the error violated her federal right to due process of law (*Hicks v. Oklahoma* (1980) 447 U.S. 343, 346). We reject these arguments because the record demonstrates the prosecution presented sufficient evidence of an ongoing conspiracy.

### a. Facts

Prior to trial, defendant moved in limine to exclude Kuretich's anticipated testimony that she overheard statements—both before and after the murder—uttered by Phillip and Carolyn Sanders and Robert Jones, linking them to both the charged conspiracy and the murder. Defendant made four contentions in her motion: (1) admission of the hearsay statements violated her federal constitutional right to confrontation; (2) the prosecution failed to present sufficient independent evidence a conspiracy to kill existed; (3) assuming there was sufficient evidence of a conspiracy to kill, the evidence was still insufficient to show a conspiracy to collect insurance proceeds; and (4) assuming there was evidence of a continuing conspiracy, "no evidence exists to show that any of the post-crime statements . . . [was] in 'furtherance' of the conspiracy as required by law." The prosecution opposed the motion by listing several facts they alleged they could prove to demonstrate the existence of an ongoing conspiracy.

Defendant's motion for a hearing pursuant to Evidence Code section 402 to establish the preliminary fact of a conspiracy was initially denied, but the trial court later changed its mind, explaining that it was concerned that not all of the statements were made during a time of an ongoing conspiracy. The court explained that "[i]n order for you to be able to get those statements in and have them apply to both defendants, you are going to have to show there was the existence of a conspiracy and both of these defendants were part of this conspiracy at the time the statements were made." The court was reluctant to allow the

76

prosecution to make an offer of proof and decided that Kuretich would be the last of the prosecution's witnesses to testify, "after [the prosecution has] presented before the jury all the evidence you feel shows the existence of the conspiracy at the time the statements were made.

The prosecution, in its offer of proof, organized Kuretich's intended statements into four categories: (1) Carolyn Sanders's question to Kuretich whether she could find someone willing to kill for insurance money; (2) a group of conversations between Phillip and Carolyn Sanders discussing whether they could find someone to commit the murder, the details of the planned killing, their inability to find a suitable hit man, and their decision that Phillip should commit the murder himself because they had already received and spent a partial payment for the killing; (3) conversations between Phillip and Carolyn Sanders and Robert Jones discussing the murder, the agreement that Phillip would commit the shooting and that Jones would drive and provide the gun, and Jones's later statement that he had obtained a gun; and (4) Jones's statements, after the murder, that he had destroyed the gun by melting it at his uncle's truck yard.

After the prosecution had presented most of its case-in-chief, the trial court ruled the prosecution had presented sufficient evidence of a conspiracy to permit the admission of statements in categories No. 2 and No. 3, but that the statements in categories No. 1 and No. 4 would be excluded. According to the trial court, the evidence did not show that at the time Carolyn asked Kuretich whether she knew of someone willing to kill for money, the Sanderses were already participating in a conspiracy with defendant to kill the victim. The court also ruled that Jones's statement about melting the gun occurred after the victim was dead and thus was not in furtherance of the conspiracy. (See *People v. Zamora* (1976) 18 Cal.3d 538, 560 ["acts committed by conspirators subsequent to the completion of the crime which is the primary object of a conspiracy cannot be deemed to be overt acts in

77

furtherance of that conspiracy"].)  Kuretich then testified and related for the jury the incriminatory conversations she overheard while living with Phillip and Carolyn Sanders.

### b.  Discussion

"Hearsay evidence is of course generally inadmissible.  (Evid. Code, § 1200.)  Hearsay statements by coconspirators, however, may nevertheless be admitted against a party if, at the threshold, the offering party presents 'independent evidence to establish prima facie the existence of . . . [a] conspiracy.' " (*People v. Hardy*, *supra*, 2 Cal.4th at p. 139.)  Pursuant to Evidence Code section 1223,[12] "[o]nce independent proof of a conspiracy has been shown, three preliminary facts must be established:  '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.' " (*Hardy*, *supra*, at p. 139, quoting *People v. Leach* (1975) 15 Cal.3d 419, 430–431, fn. 10.)  "[T]he admission of evidence is generally tested by the abuse of discretion standard" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1311), and we have applied this deferential

---

[12]     Evidence Code section 1223 sets forth the coconspirator exception and provides:  "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:
        "(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;
        "(b) The statement was made prior to or during the time that the party was participating in that conspiracy; and
        "(c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

standard to a trial court's decision to admit or deny evidence under the coconspirator exception to the hearsay rule (*People v. Sanders* (1995) 11 Cal.4th 475, 516).

At the threshold, we reject respondent's argument that defendant forfeited this issue by failing to object to Kuretich's testimony at trial. Respondent relies on "[t]he general rule . . . that 'when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal . . . .' " (*People v. Brown* (2003) 31 Cal.4th 518, 547; see *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 159, quoting *Brown* with approval.) But we immediately qualified that statement in *Brown* by recognizing that "a sufficiently definite and express ruling on a motion in limine may also serve to preserve a claim . . . ." (*Brown*, *supra*, at p. 547.) This latter exception is well established (see *People v. Ramos* (1997) 15 Cal.4th 1133, 1171; see generally *People v. Morris* (1991) 53 Cal.3d 152, 188–190 [discussing the circumstances in which a pretrial motion in limine adequately preserves an evidentiary claim for appeal], disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1), and applies here because defendant raised a sufficiently specific in limine motion and raised the same issue on appeal, the motion was aimed at a specific body of evidence (i.e., Kuretich's evidence of statements made by Phillip and Carolyn Sanders and Robert Jones), and the trial court ruled on the motion at a time when it could "determine the evidentiary question in its appropriate context." (*Morris*, *supra*, at p. 190.) Although the better practice is to renew the objection at trial, when the context of the evidence may be clearer, we conclude defendant did not forfeit this issue by failing to object at trial to Kuretich's testimony.

Turning to the merits, we conclude that because the prosecution presented sufficient evidence that the hearsay statements in categories No. 2 and No. 3 were

made by coconspirators during an ongoing conspiracy to murder Melvin Thompson, the trial court did not abuse its discretion in ruling the evidence was admissible pursuant to Evidence Code section 1223. The evidence presented by the prosecution showed the following:

(1) On June 14, 1990, eyewitness Michael Lutz observed two men he later identified as Phillip Sanders and Robert Jones drive up in a Plymouth Acclaim and saw Phillip go down the alley next to the victim's business, Kayser Service. Lutz then heard gunshots and saw Phillip return to the car and leave.

(2) Because Lutz recorded the car's license plate number, police were able to trace the car to Phillip and Carolyn Sanders's home in Sylmar. Once inside the home, police found circumstantial evidence suggesting a conspiracy: car keys to the Acclaim (linking them to the murder) and a piece of paper with defendant's phone number on it (linking Phillip and Carolyn to defendant). From this evidence, the trial court could reasonably have concluded that Phillip Sanders and Robert Jones were personally involved in the murder, that Carolyn Sanders was aware of and probably participated in the scheme, and that defendant—who stood to gain the most financially—was also involved.

(3) Shortly after police arrested Phillip, Carolyn Sanders called Christine Kuretich and asked her to immediately come home. Because Kuretich was aware of the plot to kill the victim, it is reasonable to infer that Carolyn wanted to discuss with Kuretich how they might prevent discovery of the murder conspiracy.

(4) Evidence of telephone records provided evidence of the criminal conspiracy. In the approximately six weeks preceding the murder (May 4, 1990, to June 14, 1990), those records revealed that numerous calls had been placed between Phillip Sanders's Sylmar home and Kayser Service, the repair shop where defendant and the victim worked. During this six-week period, the same records also showed several calls between defendant's home and Phillip's place of

80

employment, Barish Chrysler-Plymouth. The evidence of nearly constant communication between Phillip and defendant in the weeks leading up to the murder suggests an ongoing enterprise between them.

(5) When defendant was arrested for murder, she blurted out: "I hardly knew Phil at all. I only met him once and that was about the sale of a car." But because police had not yet revealed any evidence of Phillip Sanders's involvement, defendant's volunteered exclamation tended to show she was untruthful about her lack of familiarity or contact with Phillip Sanders, and suggested she was trying to conceal some other, deeper connection.

(6) A search of the victim's repair shop revealed a letter in defendant's handwriting describing the victim's appearance and work schedule. Because defendant would have had no need for such information, the trial court could reasonably have viewed this evidence as intended for an accomplice or coconspirator.

(7) The prosecution also presented evidence that Phillip Sanders, and to a lesser extent, Carolyn Sanders, had participated in a 1989 financial fraud with defendant. Defendant and Isabelle Sanders presented themselves to Dorothy Reik, a mortgage broker. Defendant and Phillip posed as Mellie and Melvin Thompson in order to refinance the home on South Sycamore Avenue, which was jointly owned by the victim and his ex-wife, Mellie Thompson. When Reik became suspicious of their temporary driver's licenses and asked for someone to personally vouch for their identities, Isabelle's daughter, Carolyn Moore, did so, claiming Phillip and defendant were Melvin and Mellie Thompson. Phillip was paid several thousand dollars for his part in the fraud. This evidence suggested Phillip and Carolyn Sanders were engaged in a long-running conspiracy with defendant to fleece the victim, defendant's husband, of his assets. Such evidence provided evidence of motive for the murder and insurance fraud.

81

(8) Shortly after the murder, defendant assigned the proceeds of the victim's life insurance policy to Tony DeGreef of BID Properties so she could repurchase the Hillary Drive home.  This evidence, along with evidence of the fraud in refinancing the South Sycamore Avenue home and the murder, suggest defendant was desperate to regain ownership of the house on Hillary Drive.

The prosecution, as the proponent of the evidence, was required to lay an evidentiary foundation that the challenged hearsay statements were uttered during an ongoing conspiracy.  "In order for a declaration to be admissible under the coconspirator exception to the hearsay rule, the proponent must proffer sufficient evidence to allow the trier of fact to determine that the conspiracy exists by a preponderance of the evidence.  A prima facie showing of a conspiracy for the purposes of admissibility of a coconspirator's statement under Evidence Code section 1223 simply means that a reasonable jury could find it more likely than not that the conspiracy existed at the time the statement was made." (*People v. Herrera* (2000) 83 Cal.App.4th 46, 63.)  Applying this test, we conclude the prosecution provided sufficient evidence, independent of the statements themselves, from which the trial court could have found a prima facie case that the statements were uttered by coconspirators engaged in an ongoing conspiracy with defendant to kill Melvin Thompson in order to collect on his life insurance policies.

Defendant argues against this conclusion.  While conceding the prosecution may rely on circumstantial evidence, and that proof of a physical meeting by the coconspirators is unnecessary, she contends the prosecution's evidence failed to demonstrate a conspiratorial meeting of the minds.  But the trial court could find such intent by drawing reasonable inferences from the evidence.  "Evidence is sufficient to prove a conspiracy to commit a crime 'if it *supports an inference* that the parties positively or tacitly came to a mutual understanding to commit a crime.

82

[Citation.] The existence of a conspiracy *may be inferred* from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135, italics added.) " 'The agreement in a conspiracy may be shown by . . . conduct of the defendants in mutually carrying out an activity which constitutes a crime.' " (*People v. Gonzalez* (2004) 116 Cal.App.4th 1405, 1417, disapproved on another ground in *People v. Arias* (2008) 45 Cal.4th 169, 182.) Contrary to defendant's further argument, reliance on the hearsay statements themselves was unnecessary to draw a reasonable inference that Phillip Sanders, Carolyn Sanders, Robert Jones and defendant were engaged in a criminal conspiracy to murder the victim for his life insurance proceeds.

Defendant may be understood to argue the evidence showing the existence of a conspiracy did not show she was a participating member of that conspiracy at the time the challenged statements were uttered. We reject the argument; given the evidence of intense telephone traffic between defendant and the Sanderses in the weeks leading up to the murder, defendant's strong financial incentive to kill the victim, the dearth of evidence defendant had withdrawn from the plan, her quick use of the insurance money after the victim was killed, and her blurted-out statement when arrested that she did not know "Phil," the trial court could reasonably have inferred that defendant was participating in the conspiracy at the time the challenged hearsay statements were made. Although defendant would explain her blurted-out exclamation as referring to her previous fraudulent refinancing of the South Sycamore Avenue home, a scheme in which both Phillip and Carolyn Sanders participated, that explanation was not the only possible one, and the trial court was entitled to draw a different inference: that defendant's exclamation revealed her knowledge that Phillip had murdered her husband.

83

We thus conclude the trial court did not abuse its discretion in admitting the hearsay evidence in categories No. 2 and No. 3 (see *ante*, at p. 77) pursuant to Evidence Code section 1223. Finding no state law error, we also reject defendant's contention that failure to accord her relief will deprive her of her federal right to due process of law because the state has withheld a nonconstitutional right or benefit guaranteed by state law within the meaning of *Hicks v. Oklahoma*, *supra*, 447 U.S. 343. (*People v. Webster* (1991) 54 Cal.3d 411, 439.)

We also find any possible error was harmless. Both codefendant Phillip Sanders and Carolyn Sanders testified and were subjected to cross-examination. Moreover, the jury was instructed not to consider the out-of-court statements unless it found, from independent evidence, that a conspiracy existed. (See *People v. Hinton* (2006) 37 Cal.4th 839, 895.) Under the circumstances, any error was harmless.

### 8. *Admission of Other Crimes and Bad Acts Evidence*

Defendant contends the trial court erred by admitting evidence of her prior financial misconduct to show her motive for committing the charged crimes. She further contends the court erred by admitting other evidence of her prior conduct which tended to portray her as an uncaring wife and dishonest person. Not only was this evidence inadmissible under Evidence Code sections 1101 and 352, she claims, the admission of this evidence violated her federal and state constitutional rights to due process, a fair trial, and a reliable penalty determination under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and state Constitution analogs. As we explain, the trial court did not abuse its discretion under state evidentiary law, and no constitutional error is apparent.

84

## a. Facts

The prosecution sought to introduce evidence of defendant's many previous incidents of financial fraud and shady dealings. The first incident concerns her embezzlement of $33,325 from Edith Ann, her former employer. Then, after she agreed to repay the money, defendant—without her husband's knowledge—forged his signature on a deed of trust on the home they jointly owned on Hillary Drive and used some of the money to start repaying the debt to Edith Ann. Third, when defendant stopped making payments on the note, the Hillary Drive house went into foreclosure, was purchased by BID Properties, and defendant secretly negotiated with the buyer to rent back the house. Fourth, she entered into negotiations with Tony DeGreef, the co-owner of BID Properties, to repurchase the Hillary Drive home by using Isabelle Sanders to pose as her mother, and falsely communicated to DeGreef that her husband was ill and that she expected to receive money from a (nonexistent) trust that would enable her to buy back the property.

Fifth, she obtained false identification to impersonate her husband's ex-wife, Mellie Thompson, and (along with Phillip Sanders impersonating murder victim Melvin Thompson) was successful in refinancing Mellie's home on South Sycamore Avenue, a property defendant did not legally own. Defendant used some of the $98,000 she obtained to pay her rent on the Hillary Drive house. Sixth, defendant attempted to repurchase the Hillary Drive home in her maiden name (again without her husband's knowledge) and tried to obtain a loan for $475,000 by claiming he had money deposited with "Community Bank," a nonexistent financial institution.

Defendant objected to the introduction of this evidence under Evidence Code sections 1101 and 352. The trial court excluded evidence of her embezzlement from Edith Ann (but not the fact of the debt), but ruled the balance

of the evidence was admissible under Evidence Code section 1101 to show motive and possibly even "scheme and design."  The court also denied the Evidence Code section 352 motion, concluding the probative value of the evidence outweighed any potential prejudice.

The prosecution also sought to introduce evidence that defendant had a friend remove all the jewelry from her husband's body shortly after the funeral, and that defendant pawned the jewelry the day after the funeral and spent the money two days later gambling in Laughlin, Nevada.  The prosecution also called to the stand Tommy Thompson, the victim's son, who, over objection, testified that defendant did not seem very upset after the murder, and was much more upset when her cat died.  The trial court overruled defendant's objections, ruling the evidence was admissible to rebut defendant's proffered evidence that she and her husband had a loving relationship.  Further, the court ruled the probative value of the evidence outweighed any prejudice.

### b. Discussion

The admission of evidence of prior conduct is controlled by Evidence Code section 1101.  Subdivision (a) of that section provides, with exceptions not applicable here:  "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, *or evidence of specific instances of his or her conduct*) is inadmissible when offered to prove his or her conduct on a specified occasion."  (Italics added.)  The admission of such evidence may also be limited by Evidence Code section 352, which authorizes a trial court, in its discretion, to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

86

Here, the prosecution sought to admit the evidence of defendant's prior financial misdeeds to prove her likely motivation for murdering her husband. As we recently explained: " 'Evidence that a defendant committed crimes other than those for which [she] is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.] The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect. [Citation.] When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." [Citation.]' [Citation.] ' "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.)

Setting aside whether the prior financial crimes were sufficiently similar to the conspiracy and murder involved in the instant case so as to constitute a common plan or scheme within the meaning of Evidence Code section 1101 (see *People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403), the trial court was on firm ground in concluding the evidence was admissible on the issue of motive. Of course, "uncharged conduct may be relevant to establish . . . motive." (*Id*. at p. 402, fn. 6.) "As long as there is a direct relationship between the prior offense and an element of the charged offense, introduction of that evidence is proper." (*People v. Daniels* (1991) 52 Cal.3d 815, 857.) Although motive is not an element of either of the charged offenses, it was an intermediate fact that was probative of

87

defendant's intent, and " 'the intermediate fact of motive' may be established by evidence of 'prior dissimilar crimes.' (*People v. Thompson* [(1980)] 27 Cal.3d 303, 319, fn. 23.) 'Similarity of offenses [is] not necessary to establish this theory of relevance' for the evident reason that the motive for the charged crime arises simply from the commission of the prior offense. (*Ibid*.) The existence of a motive requires a nexus between the prior crime and the current one, but such linkage is not dependent on comparison and weighing of the similar and dissimilar characteristics of the past and present crimes." (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018.) The evidence was relevant to defendant's motive and was thus admissible despite the limits set forth in Evidence Code section 1101.

*People v. Edelbacher* (1989) 47 Cal.3d 983 illustrates the point. In that case, the defendant and the victim dissolved their three-year marriage, but he still owed her $700 in child support arrearages and several thousand dollars in a division of their community property. In a trial for his ex-wife's murder, the prosecution presented evidence of his precarious financial situation. On the defendant's appeal following his conviction, we rejected his challenge to the admission of this financial evidence, explaining that while evidence of poverty is generally inadmissible to prove a motive for robbery or theft, "[o]nce the debtor-creditor relationship had been established between defendant and the victim, evidence that defendant had a number of other debts, some of which were in arrears, had *substantial relevance to show the motive for the murder* of defendant's creditor, and this relevance clearly outweighed the risk of undue prejudice." (*Id.* at p. 1024, italics added; see *People v. Cummings, supra,* 4 Cal.4th at p. 1289 [evidence that defendant's motive was to avoid capture was relevant to proving murder was intentional and premeditated]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1119 [admission of evidence murder was motivated by revenge did not violate Evid. Code, § 1101, subd. (b)].)

Defendant argues no direct connection existed between the prior financial frauds and the present murder and conspiracy, that the forged deed of trust she gave Edith Ann served only to show her poverty and indebtedness, and that her attempts to buy back the Hillary Drive house conveyed to the jury her dishonesty but lacked any relevance to the murder. The trial court, however, did not abuse its discretion in concluding that evidence of defendant's prior financial misdeeds was relevant to showing her motive for killing, and conspiring to kill, her husband in order to collect on his life insurance policies. Although the trial court exercised its discretion to exclude defendant's embezzlement from her prior employer, the balance of the evidence was relevant to show how defendant became more and more desperate to regain ownership of the Hillary Drive home, especially after Mellie Thompson became aware of the fraudulent refinancing of the South Sycamore Avenue house. The jury could infer from this evidence that defendant's financial house of cards was about to collapse, leading her to believe she had one last option to make a large financial score: killing her husband. That Phillip Sanders assisted her in some of these financial frauds was an additional link between the past acts and present crimes, and further supports our conclusion the trial court's ruling was not an abuse of discretion under either Evidence Code section 1101 or Evidence Code section 352.

The evidence concerning retrieval of the victim's jewelry after the funeral, that defendant pawned it to finance a gambling vacation in Nevada, and that she was more upset when her cat died than when her husband was murdered, was admissible for a different reason. Defendant presented evidence that she and the victim were in a loving relationship. For example, Patricia Ceaser testified that the couple appeared happy and were never seen fighting, and Rene Griffin testified defendant and the victim got along well. Charlotte Wark testified defendant and the victim were a nice couple who never fought or bickered, and

89

defendant appeared "very distraught" and "visibly upset" following her husband's murder. The prosecution was entitled to rebut that evidence with its own evidence suggesting that defendant showed no tenderness towards her husband, and that she was not particularly upset after the crime. In other words, to the extent defendant offered evidence of her good character (or lack of motive) in the form of her alleged loving relationship with her husband and her apparent distress at his murder, this evidence opened the door to allow the prosecution to present evidence of her bad character (and motive to kill him). (*People v. Banks, supra,* 59 Cal.4th at p. 1197, disapproved on another point in *People v. Scott, supra,* 61 Cal.4th at p. 391, fn. 3; see also *People v. Jones* (1998) 17 Cal.4th 279, 307 [a defendant's testimony "that he felt remorse during the interrogations that took place the day after committing the crimes" entitled the People to present a rebuttal witness who "testified that he saw no sense of remorse at that time"].)

We conclude the trial court did not abuse its discretion, under either Evidence Code section 1101 or Evidence Code section 352, in admitting the challenged evidence. We also reject defendant's associated constitutional claims. " 'The "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." [Citation.] As defendant provides no elaboration or separate argument for these constitutional claims, we decline to address further these boilerplate contentions.' " (*People v. Mills, supra,* 48 Cal.4th at p. 194.)

### 9. *Alleged* Griffin *Error*

Defense attorney Takakjian announced defendant had chosen not to testify, as was her right. The trial court sought to ensure defendant understood the implications of her decision, noting that it would be irrevocable once the prosecution began presenting its case against codefendant Phillip Sanders because

90

"they are committing themselves based on her election," and that although she presumably could testify on rebuttal, the scope of such testimony would be necessarily limited. (See *People v. Valdez*, *supra*, 55 Cal.4th at p. 169 ["The scope of proper rebuttal depends on 'the breadth and generality of the direct evidence' "].) Moreover, if Phillip suddenly rested his case without presenting a defense, "that's it." Counsel affirmed that defendant understood the risks. Later, the following colloquy occurred:

"MR. WAGER [Defense counsel]: Is the record clear to the court, we've had a discussion with Ms. Thompson about her right to testify?

"We discussed it with her and she's exercising her right not to testify and she understands it's her right?

"THE COURT: Is that correct, Mrs. Thompson?

"DEFENDANT THOMPSON: Yes, it is.

"THE COURT: Okay. [¶] I don't know how much clearer it can be."

After defendant's final witness had finished his testimony, and still in the jury's presence, Mr. Takakjian stated: "Except for the remaining witnesses we discussed, we rest." The trial court then asked: "*You are resting without calling your client?*" (Italics added.) Mr. Takakjian replied: "Yes, sir." At sidebar, counsel moved for a mistrial, claiming the court made a prohibited comment on defendant's right to remain silent. The court denied the motion.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," and the high court has interpreted this provision to "forbid[] either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin v. California* (1965) 380 U.S. 609, 615.) The constitutional prohibition against compelled self-incrimination is a right that has been incorporated to apply against the states (*Malloy v. Hogan* (1964) 378

U.S. 1, 8; see *People v. Boyette* (2002) 29 Cal.4th 381, 415, fn. 4), and we have accordingly held " 'a prosecutor is prohibited from commenting directly or indirectly on an accused's invocation of the constitutional right to silence' " (*People v. Tafoya* (2007) 42 Cal.4th 147, 184). We have also extended *Griffin* to prohibit comment on a defendant's silence by the trial judge. (*People v. Morris* (1988) 46 Cal.3d 1, 35 ["Under the rule in *Griffin*, error is committed whenever the prosecutor *or the court* comments, either directly or indirectly, upon defendant's failure to testify." (italics added)];[13] *People v. Medina* (1995) 11 Cal.4th 694, 755 [same].)

The trial court's utterance in front of the jury—"You are resting without calling your client?"—was unquestionably imprudent. We may surmise the court merely wished to impress upon defense counsel that the trial had reached the point of no return for defendant's decision whether or not to testify. But by expressing surprise at defendant's silence, the court's comment—which we assume was audible to the jury—may have inadvertently communicated to the jury that it should (or may) consider defendant's silence as evidence of her guilt. Such a message would have trenched on defendant's constitutional right to remain silent.

In previous cases, when faced with a prosecutor's utterance of comments of this type (i.e., short, isolated statements not clearly calling for improper consideration of a defendant's silence), we have generally found such comments harmless. " ' "[I]ndirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error." ' " (*People v. Boyette*, *supra*, 29 Cal.4th at pp. 455–456; see *People v. Turner* (2004) 34 Cal.4th 406, 419–420.) In

---

**13**    *People v. Morris, supra,* 46 Cal.3d 1, was disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543, footnote 5.

this case, however, the comment came from the trial judge, and it stands to reason that jurors would assign more weight to a judge's remark than that of a prosecutor. But even appreciating that difference, we find, for several reasons, the court's comment was harmless in these circumstances. First, the trial court's comment consisted of just a single short query. Second, the court's comment did not directly suggest the jury should draw an inference of guilt from defendant's decision not to testify. Third, the jury was instructed that "[a] defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact a defendant does not testify." We assume the jury followed this instruction. (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1336.)

Considering these circumstances, we conclude that any *Griffin* error flowing from the trial court's comment was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.) **14**

> 10. *Alleged Violation of Evidence Code section 351.1 (Concerning Polygraph Evidence)*
>
> a. *Facts*

On direct examination by the prosecutor, Christine Kuretich testified she had previously lied to police on several occasions by falsely placing the blame for the murder on Gregory Jones, but she eventually told the truth and implicated Phillip and Carolyn Sanders and defendant. On cross-examination, in response to defense counsel's question asking her why she changed her story, Kuretich answered: "I was nervous. It was just time I told the truth, and [police investigators] mentioned a lie detector so I knew they would know anyway."

---

**14** We reject defendant's further claim that *Griffin* error should not be subject to the harmless error test set forth in *Chapman*, but should instead be automatically reversible. Indeed, *Chapman* itself involved *Griffin* error.

93

Kuretich explained that her conscience and fear of a polygraph examination prompted her to change her story, and that when she did so she told the detective she did not want to take the polygraph examination. In response to further defense questioning, Kuretich acknowledged she never took the polygraph examination. The prosecution did not object to any of this evidence. On redirect examination, the prosecutor asked Kuretich if she would be willing to take a polygraph test that day. Before the witness answered, defense counsel successfully interposed an objection. Defense counsel also moved for a mistrial, which the trial court denied.

After Kuretich finished her testimony, the trial court, over defendant's objection, instructed the jury: "At the very end of [defense counsel's] cross-examination of the witness, he asked her whether or not she had ever taken a polygraph examination. [¶] [The prosecutor] has countered with a question that she just asked a minute ago. [¶] Both of these questions are improper." The court further instructed: "[Polygraph evidence is] not admissible in a court of law in California and you shouldn't take that into consideration at all, whether someone takes a polygraph or they don't." The court's instruction concluded, "whether or not this witness has ever taken a polygraph or wouldn't take a polygraph is totally irrelevant. You should put that out of your mind."

From this relatively brief interplay, defendant makes a series of legal claims. First, citing Evidence Code section 351.1, she argues: (1) defense counsel's questions referencing the polygraph examination constituted permissible questioning, (2) the prosecutor's question whether Kuretich would be willing to take a polygraph examination was improper, (3) the trial court's instruction to the jury failed to cure the prosecutorial error and improperly undermined defense counsel's allegedly permissible impeachment of Kuretich, and (4) these errors were prejudicial and require reversal under state law. Second, defendant contends these associated errors violated her constitutional rights under the Sixth and

94

Fourteenth Amendments[15] because the trial court improperly undermined defense counsel's ability to effectively cross-examine Kuretich, and placed information before the jury that defendant had no opportunity to confront or rebut.

### b. Discussion

Evidence Code section 351.1, subdivision (a), addresses the admission of polygraph-related evidence and states in pertinent part: "[T]he results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, . . . unless all parties stipulate to the admission of such results." By extension, Evidence Code section 351.1 also prohibits any reference to the willingness or unwillingness to take a polygraph examination (*People v. Espinoza* (1992) 3 Cal.4th 806, 817; *People v. Thornton* (1974) 11 Cal.3d 738, 763–764); we have described Evidence Code section 351.1's restriction on the admissibility of polygraph evidence as a " ' "rational and proportional means of advancing the legitimate interest in barring unreliable evidence" ' " (*People v. Hinton, supra,* 37 Cal.4th at p. 890). The exclusion of polygraph-related evidence, absent a stipulation by the parties, "has been uniformly enforced by this court and the Court of Appeal. " (*People v. McKinnon* (2011) 52 Cal.4th 610, 663.)

As a general matter, we apply "the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence" (*People v. Waidla* (2000) 22 Cal.4th 690, 717), and no reason appears why a different standard

---

**15** For this claim, defendant does not mention, and thus apparently does not rely on, the California Constitution.

should apply to questions involving the admission of polygraph-related evidence. Applying this deferential standard here, we find no basis for reversal.

The first mention of a polygraph test was during cross-examination of Kuretich when defense counsel asked her why she changed her story to police. She replied: "It was just time I told the truth, and [police investigators] mentioned a lie detector so I knew they would know anyway." Kuretich explained that her conscience and fear of a polygraph examination prompted her to change her story. The prosecutor did not object to this evidence nor was it later stricken or included in the trial court's admonition. We observe that this testimony did not constitute "an offer to take, [a] failure to take, or [the] taking of a polygraph examination." (Evid. Code, § 351.1.) Kuretich may have expressed fear of, or anxiety about, taking the test but did not say she was unwilling to do so. In any event, the evidence was admitted without objection so we have no occasion to question its admissibility.

The second reference to a polygraph test presents a different situation. In response to defense questioning, Kuretich testified she never did take a polygraph test. Defense counsel likely elicited this testimony in an attempt to undermine Kuretich's testimony implicating defendant and the Sanderses in the murder plot. That is, because Kuretich never actually took a polygraph test, counsel sought to suggest to the jury that Kuretich's story was inaccurate or untrue. But whatever counsel's tactical reason for eliciting the testimony, the evidence was inadmissible under Evidence Code section 351.1 because it constituted evidence of a "failure to take . . . a polygraph examination." The trial court thus acted within its discretion by striking the evidence and instructing the jury to disregard it.

The third reference to a polygraph test was on redirect examination, when the prosecutor asked Kuretich whether she would be willing to take a polygraph examination "today." Although she never answered the question due to a timely

96

objection, the question sought evidence of the witness's willingness to take a polygraph test and was thus improper. (*People v. Espinoza*, *supra*, 3 Cal.4th at p. 817.) The trial court thus acted within its discretion by striking the question and instructing the jury to disregard it.

Defendant argues the curative instruction was both inadequate to redress the erroneous admission of polygraph-related evidence, and also unfairly undermined her legitimate effort to impeach the witness's reasons for changing her story. The latter point is meritless, as defendant was able to have Kuretich acknowledge to the jury that she changed her story because of her fear of having to take a polygraph test, and that testimony remained for the jury's consideration when weighing the witness's credibility. The trial court's admonition was directed only to Kuretich's additional statement that she never took the threatened test, evidence that was directly barred by Evidence Code section 351.1. We perceive no interference with defendant's ability to cross-examine and impeach Kuretich, or to otherwise present a defense.

Regarding the efficacy of the trial court's admonition, the reason that defendant believes it was inadequate is unclear. Where polygraph evidence has been erroneously introduced, this court has held that "a trial court's timely admonition, which the jury is presumed to have followed, cures prejudice resulting from the admission of such evidence." (*People v. Cox* (2003) 30 Cal.4th 916, 953.) Defendant cites three cases she claims demonstrates the ineffectual nature of the court's instruction, but none compels a contrary conclusion in this case. In *People v. Basuta* (2001) 94 Cal.App.4th 370, the prosecutor violated a preexisting court order not to mention that the main witness had taken a polygraph test. The appellate court held the error, in combination with another more serious error by the trial court, was prejudicial because both errors "substantially affected the crucial issue in the case—[the main witness's] credibility." (*Id.* at p. 391.) But

97

unlike in *Basuta*, Kuretich was not the prosecution's main witness and no other serious evidentiary errors occurred. *Basuta* thus does not support a conclusion that the trial court's instruction was ineffective to address the admission of improper polygraph-related evidence.

*People v. Parrella* (1958) 158 Cal.App.2d 140, on which defendant also relies, is similarly inapposite. In *Parella*, the appellate court found the error in admitting polygraph evidence was not prejudicial because the trial court had "carefully, correctly and fully warned the jury" not to consider any evidence about the polygraph examination. (*Id.* at p. 148.) Although defendant contends the court here did not issue such a careful instruction, instead giving a "confusing and rambling instruction," she fails to explain specifically in what way the instruction was flawed. Her further complaint the court did not "immediately" admonish the jury but did so only "at a later point," cannot be sustained, for the record shows that, immediately after the polygraph evidence was admitted, the court and parties had a brief discussion in chambers, after which the trial court admonished the jury regarding the evidence.

The same reasoning applies to *People v. Cox*, *supra*, 30 Cal.4th 916. In *Cox*, this court held the trial court cured the prejudice resulting from the admission of polygraph evidence because "there was one improper question that was immediately struck, and the jury was given a strong admonition." (*Id.* at p. 954.) Again, although characterizing the instant trial court's admonition as "confusing and contradictory," defendant does not explain in what way the warning was deficient.

We conclude the trial court did not abuse its discretion under Evidence Code section 351.1 in striking part of Kuretich's testimony and admonishing the jury. There being no reversible error under state law, we also reject defendant's

98

contention the polygraph-related evidence violated her federal constitutional rights. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1094.)

### 11. *The Instruction on Motive*

Defendant argues the instruction read to the jury concerning motive, patterned after CALJIC No. 2.51, violated her state and federal constitutional rights to a fair trial, due process, and a reliable verdict in a capital case. (See U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7 & 15.) That instruction, as read to the jury, stated: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. [¶] Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. [¶] You will therefore give its presence or absence, as the case may be, the weight to which you find it is entitled." Defendant asserts this instruction unconstitutionally (1) allowed the jury to determine guilt on motive alone; (2) reduced the prosecution's burden of proof by suggesting the terms "motive" and "intent" were interchangeable; and (3) shifted the burden of proof to imply that defendant bore the burden to prove her innocence. None of these arguments has merit.

We considered and rejected defendant's first contention in *People v. Snow* (2003) 30 Cal.4th 43. There we explained that "[i]f the challenged instruction somehow suggested that motive alone was sufficient to establish guilt, defendant's point might have merit. But in fact the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish *all* the elements of murder." (*Id.* at pp. 97–98, italics omitted.) Thus, "[w]hen CALJIC No. 2.51 is taken together with the instruction on the concurrence of act and specific intent (CALJIC No. 3.31) and the instruction outlining the elements of murder and

requiring each of them to be proved in order to prove the crime (CALJIC No. 8.10) [both of which were given here], there is no reasonable likelihood [citation] it would be read as suggesting that proof of motive alone may establish guilt of murder." (*Id.* at p. 98; see *People v. Riggs* (2008) 44 Cal.4th 248, 314 [citing *Snow* with approval].)

We also reject defendant's argument the standard instruction on motive given in her case would lead the jury inevitably to confuse "motive" with "intent." Motive is not an element of a crime; rather, "[m]otive describes the reason a person chooses to commit a crime," which "is different from a required mental state such as intent or malice." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) As relevant here, the jury was instructed that a conspiracy to commit murder required the specific intent to agree to commit the murder. Thus, "the instructions here as a whole did not refer to motive and intent interchangeably, and there was no reasonable likelihood the jury understood the terms to be synonymous." (*People v. Wilson* (2008) 43 Cal.4th 1, 22.)

Finally, we reject defendant's argument that CALJIC No. 2.51 impermissibly shifted the burden of proof by implying that defendant had the burden of establishing her innocence. As we explained in *People v. Prieto* (2003) 30 Cal.4th 226, the instruction uses the word "innocence" " 'as a direction signal or compass. It does not tell the jurors they must find innocence, nor does it lighten the prosecution's burden of proof, upon which the jury received full and complete instructions.' " (*Id.* at p. 254; see *People v. Dement* (2011) 53 Cal.4th 1, 54–55 [CALJIC No. 2.51 "does not shift the burden of proof to the defendant to show an alternative motive to that advanced by the prosecution"].) Accordingly, "no reasonable juror would misconstrue CALJIC No. 2.51 as 'a standard of proof instruction apart from the reasonable doubt standard set forth clearly in CALJIC No. 2.90.' " (*Prieto*, *supra*, at p. 254.)

Having found no error under state law, we also reject defendant's claim the instruction deprived her of her federal constitutional rights to a fair trial, due process, or a reliable verdict in a capital case.

## II. PENALTY PHASE

### A. Facts

The parties stipulated that defendant had been convicted of felony forgery (§ 470) in both 1974 and 1975. Carolyn Jones, the victim's daughter, testified for the prosecution, saying she last saw her father on Christmas Day, 1989, but was thereafter instructed by her lawyer to have no contact with him because she and her mother had sued him (and defendant) over the fraudulent refinancing of Mellie Thompson's house. She later discovered her father knew nothing of the fraud, and she was heartbroken that she never got the chance to speak to him before he was murdered. She and her father had always spent time together on their birthdays, if only on the telephone, and she missed him very much. She felt as if she had lost a good friend.

In mitigation, defendant called Lelia Miotzek and Karen Brudney, both of whom worked as chaplains at the Sybil Brand Institute, the women's jail where defendant spent two years in pretrial detention. Both witnesses described defendant as a faithful and reliable person who came to church every Sunday and attended Bible study every week. They both attested to defendant's helpfulness and compassion for others. Brudney stated defendant diligently attended Bible study classes, helped out other inmates, and was "so reliable [that] I really count on her."

Defendant's son, Girard Jacquet, also provided mitigating evidence. Jacquet testified he considered the victim, Melvin Thompson, to be his father, although he was not Jacquet's biological father. The victim's death affected the

101

witness "tremendously." He had been close to his mother until the time of the murder. She instilled in him "values of loving and caring for people" and "encourage[d] [him] to live as an honorable person." He planned to continue seeing his mother because he loves her.

## B. Discussion

### 1. *Admission of Other Crimes and Bad Acts Evidence*

Defendant contends the trial court abused its discretion by permitting the prosecution to cross-examine penalty phase witnesses Chaplain Lelia Miotzek by asking her whether she was aware of defendant's many financial misdeeds and whether those past crimes changed her opinion of defendant's character. The applicable law is settled: "In general, the prosecution may not present evidence of a defendant's bad character during its penalty phase case unless the evidence is admissible as one of the aggravating factors listed in section 190.3." (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 141.) " '[W]hen the defense presents mitigating evidence of a defendant's good character, it has put the defendant's character in issue, thus opening the door to prosecution evidence tending to rebut that "specific asserted aspect of [the defendant's] personality." [Citation.] Such rebuttal evidence, however, must be specific and "must relate directly to a particular incident or character trait defendant offers in his own behalf." ' " (*People v. Raley* (1992) 2 Cal.4th 870, 912.) "The admission of rebuttal evidence is a matter for the sound discretion of the trial court." (*Ibid*.)

Asked to describe defendant's character, Chaplain Miotzek testified that defendant "is a person who I could trust to be consistent in Bible study, in church, in any type of activity that I might assign to her. She would be consistent in doing a Bible study or completing that." In addition, the witness opined: "There's commitment. There's a hunger within [defendant] to know the Lord of God and to

102

let God's word administer to her heart and her life." Over a defense objection that it was beyond the scope of the direct testimony, the prosecutor asked Miotzek whether she had heard that when defendant worked for Aetna Sheet Metal Company in 1972, she stole money from her employer, did the same thing in 1973 when she worked for Franklin Sales Company, and in 1986 embezzled more than $33,000 from her employer, Edith Ann. The prosecutor also asked Miotzek whether she had heard defendant forged her husband's name on a deed of trust, that she represented herself to be the victim's former wife to obtain a loan, obtained a driver's license and Social Security card in a different name in 1990 and used them to create a new identity for herself, falsified a letter from a fictitious trust company to obtain a loan, falsely changed the title on a Rolls Royce that belonged to someone else and sold it, and wrote a letter in 1974 to the court, seeking lenient treatment by falsely claiming she had had a kidney removed and needed dialysis. Miotzek said these incidents did not change her opinion of defendant.

We perceive no abuse of discretion. Defense counsel asked the witness to describe defendant's character, and the evidence of her good character thereby opened the door to legitimate cross-examination about her bad character. Defendant argues the prosecutor's questioning went beyond the scope of the direct testimony because the witness had not testified as to defendant's honesty, but addressed only her dependability and reliability. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1072 ["Generally, the scope of bad character evidence offered in rebuttal must relate directly to the particular character trait concerning which the defendant has presented evidence."].) In support of her argument, defendant contends that "[t]rustworthiness and reliability, while somewhat synonymous, identify distinctly different characteristics." We cannot say the trial court abused its discretion—that is, acted in an " ' "arbitrary, capricious, or patently absurd

103

manner" ' " (*People v. Lucas*, *supra*, 60 Cal.4th at p. 240)—in concluding the defense opened the door to bad character evidence by eliciting "an opinion from [the witness] that [defendant] would be a good, trustworthy, rule-abiding prisoner should she be confined to the state prison for the rest of her life." Having found no abuse of discretion, we reject defendant's argument the court erred by admitting evidence of her past crimes to impeach Chaplain Miotzek.

### 2. Alleged Instructional Error at the Penalty Phase

#### a. Manner of Execution

Defendant sought to introduce evidence about how a person would die in the gas chamber. In discussing the question of admissibility of the evidence, the trial court noted a new law would soon go into effect, allowing a condemned person to opt for lethal injection. The prosecution objected to defendant's proposed evidence, asserting that if defendant were allowed to present such evidence, it intended to introduce evidence concerning the conditions of confinement for a life prisoner. The trial court ruled that if the parties stipulated to each other's evidence, it would not intervene, but it would otherwise sustain the prosecutor's objection.[16] The parties did not stipulate and the evidence about the gas chamber was excluded.

Thereafter, in closing argument, the prosecutor addressed testimony defendant had presented from the two jail chaplains, both of whom suggested defendant was a compassionate person. The prosecutor argued defendant was like a Nazi soldier who worked in the crematoriums and gas chambers during the day

---

[16] The trial court's ruling was correct. "Our cases make clear that information about administration of the death penalty does not aid the jury in making an individualized determination of the appropriate penalty in a particular case." (*People v. Pride* (1992) 3 Cal.4th 195, 260.)

but otherwise led an apparently normal and unexceptional life. In rebuttal, defense counsel replied: "I found it exceptionally ironic that [the prosecutor] talks about an analogy of Cathy Thompson and Nazis who gas Jews in World War II since that is precisely what they want to do with Cathy Thompson is death by lethal gas." Defense counsel continued: "I leave for your consideration and thought [that] even in . . . the Gulf War where the task is to kill your enemy. The one thing that we think of as unconscionable is the use of lethal gas." Defense counsel mentioned lethal gas once more, saying: "Perhaps it's beneficial to ask yourself if you vote for death, would you travel to San Quentin to witness the execution? If you vote for death, would you have the guts to push the button to drop the cyanide pellets?"

Following the close of argument, the prosecutor argued that because defense counsel had raised the issue of execution by lethal gas in her closing argument, the trial court should instruct the jury that, should it vote for death, defendant would be able to elect lethal injection instead of gas as a method of execution. The trial court agreed, and over defense objection, instructed the jury: "During the defense argument reference was made to the death penalty being carried out by lethal gas. Effective the 1st of January, 1993, the law will change allowing the condemned to select between lethal gas or lethal injection." The trial court thereafter denied defendant's motion for a mistrial.

Defendant contends the trial court's instruction violated her right to be free of cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Citing *Caldwell v. Mississippi* (1985) 472 U.S. 320 in support, she argues that by informing the jury that she would be entitled to elect an alternative to lethal gas as a method of execution, the instruction diminished the jury's sense of responsibility for its sentencing decision. In *Caldwell*, the high court reversed a Mississippi death sentence because the prosecutor had argued to

105

the jury that it should not view its verdict as the final word because an appellate court would review the jury's decision for correctness. In reversing the judgment, the high court explained that "it is constitutionally impermissible [under the Eighth Amendment] to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Caldwell*, *supra*, at pp. 328–329.) As we explained in *People v. Ledesma* (2006) 39 Cal.4th 641, later high court cases have suggested that *Caldwell* should not be given an expansive reading: "*Caldwell* simply requires that the jury not be mis[led] into believing that the responsibility for the sentencing decision lies elsewhere." (*Ledesma*, *supra*, at p. 733, discussing *Romano v. Oklahoma* (1994) 512 U.S. 1.)

To determine whether the jury was misled, we must ask how a reasonable juror would have understood the challenged instruction. (*People v. Pearson* (2013) 56 Cal.4th 393, 476; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72 ["in reviewing an ambiguous instruction . . . , we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution"].) We find the trial court's instruction regarding the method of execution could not reasonably have misled the jury into believing ultimate responsibility for its penalty decision lay elsewhere. The court truthfully informed the jury that execution by lethal gas was no longer the only option because a new law would enable defendant to elect an alternative method of execution. Nothing about that information suggested responsibility for the jury's life-or-death decision lay anywhere other than with the 12 jurors. Although the instruction communicated to the jury that the method of execution would, to some degree, be defendant's choice, such information is not equivalent to informing the jury that it should consider its role in any way diminished. We thus reject as unreasonable defendant's claim the instruction told "the jurors that the final

106

decision on [defendant's] execution rested with [her] . . . thus diminishing their sense of responsibility for their penalty decision." Accordingly, we find the instruction did not violate defendant's rights under the Eighth Amendment.

### b. CALJIC No. 8.88

Defendant contends CALJIC No. 8.88 was constitutionally flawed because it "did not adequately convey several critical deliberative principles, and was misleading and vague in crucial respects." We have considered and rejected these precise claims many times before, and defendant presents no persuasive reason why we should reconsider our precedents. (See, e.g., *People v. Souza* (2012) 54 Cal.4th 90, 141 ["We repeatedly have held that the standard version of CALJIC No. 8.88 is adequate and correct."].) Thus:

• The instruction's use of the phrase "so substantial" is not unconstitutionally vague under the Eighth and Fourteenth Amendments. (*People v. Casares* (2016) 62 Cal.4th 808, 854.)

• CALJIC No. 8.88 does not "impermissibly fail to inform the jury that it must find death was an appropriate, not just an authorized, penalty." (*People v. Jones*, *supra*, 57 Cal.4th at p. 980.)

• CALJIC No. 8.88 does not impermissibly fail to define the meaning of aggravation or mitigation. (*People v. Bivert* (2011) 52 Cal.4th 96, 124 [" ' "There is no need to instruct the jury . . . regarding the meaning of the term 'mitigation' " ' "]; *People v. Samayoa* (1997) 15 Cal.4th 795, 862.)

• The instruction is not constitutionally defective despite failing to inform jurors they could impose a life sentence even if they concluded that aggravation outweighed mitigation. (*People v. Bivert*, *supra*, 52 Cal.4th at p. 124.)

• CALJIC No. 8.88 does not impermissibly fail to inform the jury that neither party bears the burden of persuasion regarding the appropriateness of the death penalty. (*People v. Abel* (2012) 53 Cal.4th 891, 943.)

### 3. *Challenges to California's Death Penalty Law*

Defendant contends section 190.3, the statute setting forth the death penalty in this state, is, for several reasons, constitutionally defective. We have considered and rejected these precise claims many times before, and defendant presents no persuasive reason why we should reconsider settled law. Thus:

• " 'Section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty.' " (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1376 (*Seumanu*).)

• Neither the state nor federal Constitution requires the prosecution to bear the burden of proof or persuasion at the penalty phase of a capital trial, or requires the jury to find beyond a reasonable doubt that the aggravating factors have been proved, the aggravating factors outweigh the mitigating factors, or death is the appropriate sentence. "Moreover, none of the United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) require a different result [citation]." (*Seumanu*, *supra*, 61 Cal.4th at p. 1376.)

• Section 190.3 is constitutional despite failing to require the jury to find the truth of aggravating circumstances by unanimous vote. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 56.)

• "Neither 'the Sixth, Eighth, or Fourteenth Amendment require[s] written findings or other specific findings by the jury regarding the aggravating factors.' " (*Seumanu*, *supra*, 61 Cal.4th at p. 1376.)

• " 'The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment (U.S. Const., 6th, 8th, 14th Amends.), do not require intercase proportionality review on appeal.' " (*Seumanu*, *supra*, 61 Cal.4th at p. 1376.)

• " 'The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b)' [citation], and need not first decide the prior criminal activity was true beyond a reasonable doubt by unanimous vote [citation]. Further, permitting the jury to consider prior unadjudicated criminal activity as aggravating evidence did not unconstitutionally allow it to impose the death penalty on unreliable, undiscussed, or undebated evidence, especially because the jury was instructed that no juror could consider such evidence unless he or she found beyond a reasonable doubt that defendant had committed the crime or crimes." (*People v. Jones*, *supra*, 57 Cal.4th at p. 980.)

• "Assertedly denying some procedural protections to capital defendants that would apply to noncapital defendants," such as disparate sentence review, requiring written findings, and requiring unanimity on aggravating factors does not violate equal protection. (*People v. Jones*, *supra*, 57 Cal.4th at p. 981.)

### 4. *International Law*

Defendant contends the "California death penalty procedure violates the provisions of international treaties and the fundamental precepts of international human rights," citing, specifically, article VII of the International Covenant on Civil and Political Rights (ICCPR). We have rejected this exact claim many times in previous cases. (See, e.g., *People v. Capistrano* (2014) 59 Cal.4th 830, 881;

109

*People v. Abel*, *supra*, 53 Cal.4th at p. 942.)  As we have explained, "[a]lthough the United States is a signatory [to the ICCPR], it signed the treaty on the express condition '[t]hat the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment . . . .' " (*People v. Brown* (2004) 33 Cal.4th 382, 403–404.) Defendant does not persuade us we should reconsider these decisions.

### 5.  *Cumulative Prejudice*

Finally, defendant contends that "[e]ven assuming that none of the errors identified . . . are prejudicial by themselves, the cumulative effect of these errors undermines the confidence in the integrity of the guilt phase proceedings."  As explained, we have found all of defendant's claims of error lack substantive merit, save two:  (1) Regarding her claim the trial court committed *Griffin* error by commenting on her failure to take the stand and testify (*Griffin v. California*, *supra*, 380 U.S. 609),  we reject the claim without reaching its merits because no prejudice resulted from the trial court's comment; and (2) Regarding her claim the trial court violated her constitutional rights by excluding her (and her attorneys) from the hearing to discuss Phillip Sanders's discovery obligations concerning the jail letters, we similarly decline to reach the merits of the claim because no prejudice resulted from the absence of the defense team from the hearing.  As each of those claims was individually harmless, we conclude their aggregate effect was also harmless.  Accordingly, we reject defendant's claim of cumulative prejudice.

110

### III. CONCLUSION

The guilt and penalty judgments are affirmed in their entirety.


**WERDEGAR, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Thompson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S033901
**Date Filed:** December 1, 2016

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** George W. Trammell, III

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Denise Kendall and Gail R. Weinheimer, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, John R. Gorey and A. Scott Hayward, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Denise Kendall
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

A. Scott Hayward
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2370